**UNITED STATES of America, Appellee,**

v.

**Richard MASTRANGELO, Appellant.**

No. 257, Docket 81–1270.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1981.

Decided Oct. 28, 1981.

Gerald Shargel, New York City (Graham Hughes, New York City, of counsel), for appellant.

Susan E. Shepard, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the E. D. New York, Vivian Shevitz, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before OAKES and MESKILL, Circuit Judges, and BLUMENFELD,* District Judge.

OAKES, Circuit Judge:

This expedited appeal raises anew the question whether there was "manifest necessity," *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), for the declaration of a mistrial. What makes this case unique is that the mistrial was declared following the killing of the Government's only witness against appellant, Richard Mastrangelo. The killing occurred on the witness's way to the courtroom to testify in a trial in which the Government's case against the codefendant, Joseph Dazzo, was essentially complete. The United States District Court for the Eastern District of New York, Jack B. Weinstein, Chief Judge, denied appellant's motion to dismiss Counts 1, 4, and 5 of the indictment on the ground of double jeopardy. We hold first that appellant had for all practical purposes withdrawn his previous motion for a mistrial on other grounds, so that *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976), does not apply and we must examine the declaration of the mistrial under the manifest-necessity standard. We hold second, however, that

the court's ordering a mistrial after the witness's murder was proper under that standard, and we accordingly affirm.

FACTS

Appellant Mastrangelo and his codefendant Joseph Dazzo were charged in a superseding indictment, along with three others who were severed before trial, with conspiracy to import and to possess with intent to distribute substantial quantities of marijuana, 21 U.S.C. § 846(1) (Count 1), possession with intent to distribute of approximately 23.4 tons of marijuana (a Schedule I controlled substance) and 499,000 Methaqualone tablets (a Schedule II controlled substance), 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2 (Count 4), and intentional importation into the United States at Yancarib Enterprises in Queens, New York, aboard the vessel *Terry's Dream*, of the same amounts of marijuana and Methaqualone, 21 U.S.C. §§ 952(a), 960, 18 U.S.C. § 2 (Count 5). Count 6, which was severed before the Mastrangelo-Dazzo trial, charged Mastrangelo with knowingly and corruptly endeavoring to influence the due administration of justice, 18 U.S.C. § 1503.[1]

The Government's evidence at the trial before Judge Weinstein that commenced on April 27, 1981, established the existence of a conspiracy to import boatloads of marijuana into New York from Colombia, South America, between November 10, 1977, and November 11, 1978. On the latter date law enforcement officers in Queens interrupted the offloading of a 75-foot shrimp boat known as *Terry's Dream*, which members of the conspiracy had purchased in Florida in November 1977, and used several times for marijuana importation. At the Yancarib Marina in Queens the officers seized the shrimp boat, a tugboat called the *Bill Mather*, four trucks, three vans, and a Buick sedan. The vessels and vehicles contained a total of 23.4 tons of marijuana and 499,000 Methaqualone tablets. The persons offloading the boat escaped.

---

* Of the District of Connecticut, sitting by designation.

1. Judge Weinstein has ordered the obstruction-of-justice count rejoined for the retrial of appellant. Counts 2 and 3 of the indictment name neither Dazzo nor Mastrangelo and are thus not at issue here.

At trial, four witnesses connected codefendant Joseph Dazzo to the purchase and repair of the tugboat used to bring the *Terry's Dream* into New York harbor. Frederick Ardolino identified Dazzo as one person who was with him in Virginia to purchase the *Bill Mather* in February 1978. Alfred Jensen, the agent for the seller of the *Bill Mather*, corroborated Ardolino's testimony. James Muller and Kathleen Muller, employees at a family-owned boatyard in Brooklyn, testified about repair work on the *Bill Mather* in April 1978, identifying Dazzo as the person who used the alias "John Ward, Jr.," and directed the repair work.

Important to the sequence of events and to the judge's later ruling on the mistrial was the cross-examination of Ms. Muller on April 29. Dazzo's attorney inquired about a statement she had made to one Haggerty, an investigator employed by Dazzo who had shown her some pictures of people. Asked if she had recognized any of the people, she replied that one of the pictures looked like the person who had identified himself as John Ward. The following colloquy then occurred:

Q. But you did—Did you also tell Mr. Haggerty that you were not sure—

A. I had reasons, what I said to Mr. Haggerty, when he was in my office.

On redirect, the Government asked Ms. Muller to explain the circumstances of her conversation with Haggerty. After she explained that Haggerty had said he was an investigator for Dazzo's attorney, the Government asked her the following question:

Q. You recall on cross-examination you started to say you had reasons for telling Mr. Haggerty what you told him. What were those reasons?

To this, Mastrangelo's counsel, Mr. Coiro, objected, seeking a sidebar conference. The court excused the jury, questioned the witness, and then announced that it would issue the following curative instruction:

You can say—we can stipulate that she would have answered in words or substance that she did not feel under the circumstances that she wanted to be fully candid with Mr. Haggerty.

Although the Government and Dazzo's attorney agreed to the curative instruction, appellant's counsel, alleging that the questioning implied that the witness had been threatened, moved for a mistrial. Judge Weinstein denied this motion and, after giving the instruction to the jury, again inquired whether it was satisfactory. Counsel for the Government and Dazzo stated that it was, but Mr. Coiro, for Mastrangelo, had no comment.

By the afternoon of April 29, the third day of trial, the case against Dazzo had been substantially completed, and the Government was ready to begin its case against Mastrangelo. The Government originally had hoped to introduce a tape recording made on February 1, 1979, of a conversation between James Bennett and Richard Mastrangelo. Bennett had consented to the taping; this conversation was the subject of the severed sixth count of the indictment for obstruction of justice. The court had, however, in a pretrial ruling, excluded the tape as prejudicial to Dazzo under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny. James Bennett, who was not implicated in the conspiracy, had worked with his brother at Smitty's Auto & Truck Sales in Brooklyn and had evidently sold to Mastrangelo some of the trucks that were among the vehicles seized at the Yancarib Marina. In its opening the Government had stated that Mastrangelo had purchased three large moving trucks from Smitty's Auto & Truck Sales in February 1978, paying in cash, and that two of those trucks were seized at the Yancarib Marina, one loaded with marijuana. The Government stated that in September 1978 Mastrangelo paid cash for two more trucks, which were put in the name of Allrite Trucking, a corporation formed by "the organization," and that both of the later-purchased trucks were seized at the Yancarib Marina loaded with marijuana. In the excluded tape-recorded conversation, Mastrangelo, after learning of Bennett's subpoena

by a grand jury, tells Bennett to say "[n]othing" in front of the grand jury and "if they ask, in other words, uh, if they say anything with me, you can't say me. Do you understand?" Bennett, apparently not getting the message, replies, "Well, I say, ah, I say I sold you the trucks, right?" And Mastrangelo says, "You can't.... You can't say that. Because you didn't sell me the trucks." When Bennett says, "Well, I actually sold you the trucks," Mastrangelo tells him, "You didn't. You know, Jim? You know what I mean you really didn't?" He adds, in what could well be interpreted as a threat, "You know what I mean Jim it's for your own good 'cause 'cause then ah, in other words they're going fuck everything around. I'll get back to you as far as anything...." Later in the conversation, Mastrangelo tells Bennett, "If they show you a picture of anybody, that's not him, that's not him. In other words, they can show you a picture of a million guys, that's not him. That's it. You know what I mean Jim? And that's all you got to say." When Bennett protests, "Well I have to say I sold the trucks"—the Government has seen his book showing the sale of the trucks—Mastrangelo replies, "Don't do that because you know why Jimmy? I could turn around and say no he didn't. There's nothing on paper." Mastrangelo continues, in possibly threatening language, "You know. So let's do it the right way.... This way. Cause they're busting your balls. You got your fucking book. There's my fucking book. What do you want?" Bennett says, "Yeah," and Mastrangelo says, "You know what I mean Jim?" Bennett says, "Uh huh," and Mastrangelo says, "And that's it, case closed."

The court having excluded this evidence because it was prejudicial to Dazzo—evidence that not only incriminated Mastrangelo directly but would be powerful evidence of his consciousness of guilt—it became essential for the Government to call James Bennett himself for proof of the truck transaction. According to the Government's uncontested representation to the trial court, Bennett flew into New York from Florida, where he was living semi-

retired, the day before he was to testify. He was at the United States Attorney's office until 10:00 p. m. and was then driven to his daughter's home in Brooklyn. Again according to the Government's uncontested representation, Bennett, on his way to the courthouse on April 29, 1981, "left his daughter's home chased by two men, and [was] shot dead on the street."

Upon so informing the court, the Government first renewed its application to use the tape but the court said, "All I can do is sever Mr. Dazzo and Mr. Mastrangelo and start all over again." The court, aware of the double jeopardy problem, asked counsel for Mastrangelo "whether you make a motion for a mistrial, and renew your motion for a severance?" Counsel asked for time to consider that. A second application by the Government was that Mastrangelo's bail be increased to $500,000. The court said that as to Dazzo it saw no reason why "we could not go ahead," but revoked Mastrangelo's bail and then called in the marshals to arrest Mastrangelo and take him into custody. The court made arrangements to sequester the jury and ordered jurors not to communicate with anyone. Additionally, the court asked the Government to arrange to have protective custody for the Mullers, who testified earlier that day.

At this point the court informed Mastrangelo's counsel that "[y]ou have already moved for a mistrial and I am considering the granting of that motion. That has not been withdrawn.... I denied the motion [earlier], but I am reconsidering it and I am reserving decision." Judge Weinstein again noted his unwillingness to rejoin the obstruction count or play the tape, for fear of tainting the jury in connection with the "clean case against Dazzo." Further discussion indicated that the case against Dazzo would be closed with a few formalities. The court gave Mastrangelo's counsel more time to make known his position, and after consultation counsel stated on the record that "the defendant Mastrangelo's position is that we are not moving for a mistrial.... At the present time ... there is

no motion on behalf of the defendant Mastrangelo before the Court at this time." The court, however, then granted the defendant Mastrangelo's previous motion for a mistrial and severance (based on Ms. Muller's testimony), but added that "[i]f that motion had not been made by the defendant, I would have granted it on my own motion in view of these circumstances. If I had not granted it on my own motion, I would have granted it on the government's motion." Mastrangelo's counsel stated for the record that "at this time I am not renewing that motion [for a mistrial]." The judge ordered that the portion of the transcript containing a reference to the Mullers' address be sealed, and the trial against Dazzo proceeded, culminating in his conviction.

### DISCUSSION

■ The Government argues that Mastrangelo did not withdraw his motion for a mistrial before it was granted and that accordingly under *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976), any claim of double jeopardy is unavailable. We agree with appellant, however, that for all practical purposes, though not in so many words, the motion for a mistrial based upon Ms. Muller's testimony was withdrawn. Before the court granted the motion, defense counsel stated on the record, "After consultation, Judge, the defendant Mastrangelo's position is that we are not moving for a mistrial . . . At the present time, in light of the unfortunate situation that has happened, there is no motion on behalf of the defendant Mastrangelo before the Court at this time." This case is similar to *United States v. Evers*, 569 F.2d 876, 878 (5th Cir. 1978), in which defense counsel had moved for a mistrial but then "advised the court that because defendant was anxious not to retry the case, and because he did not think the evidence sufficient for the case to go to the jury, he would withdraw his motion for a mistrial." This in effect was what defense counsel did here, and therefore the question must turn on "manifest necessity."

■ In this connection the arguments below on Mastrangelo's double-jeopardy motion shed further light on the trial court's decision, though we realize that under *Arizona v. Washington*, 434 U.S. 497, 516–17, 98 S.Ct. 824, 836, 54 L.Ed.2d 717 (1978), the record speaks for itself in connection with manifest necessity and the trial court's mistrial ruling is entitled to great deference irrespective of any statement of reasons by the trial court. *See United States v. Grasso*, 600 F.2d 342, 343 (2d Cir. 1979) (recognizing that the court's previous holding in *United States v. Grasso*, 552 F.2d 46 (2d Cir. 1977), that findings by the trial court were necessary had been "plainly overruled by the Supreme Court" in *Arizona v. Washington*).

The arguments below on the motion now appealed from demonstrate that the district court's underlying reason for declaring a mistrial was that the judge quite understandably believed that Mastrangelo was responsible for Bennett's death. That the court, immediately after being informed of Bennett's death, (a) sequestered the jury, (b) revoked Mastrangelo's bail, (c) ordered protective custody for the Mullers, and (d) sealed the portion of the transcript containing the Mullers' address, confirms this, though it was not made explicit at that time. As the court below stated at argument,

I was under the distinct impression, and I believe that by a preponderance of the evidence, based on what I then had before me, I was warranted in finding that this defendant, Mastrangelo, either directly arranged for the killing of the witness or was advised of the possible killing of the witness and acquiesced. He was the only person that could gain from it.

Dazzo couldn't gain from it at all. He was, by that time, destroyed by the government's case. . . .

There was evidence before the Court that this very defendant, Mastrangelo, had threatened other witnesses, in fact, he had been indicted and I severed that count.

The tape was clear that he had threatened another witness. Mastrangelo was out on bail. The Court observed him during this emergency. Everybody in this courtroom was shocked. Mr. Coiro was very upset. The defendant, Mastrangelo, took it like a soldier. He didn't smile, as I recall, but he certainly wasn't upset by it. At best, he was neutral on the issue.

It just is inconceivable ... that this radical step to aid Mastrangelo, who is the only person that could have been helped by killing this witness, would have been taken without his knowledge, acquiescence, or orders. And that, it seems to me, is the clearest situation of a finding of manifest necessity that you can get.

■ Appellant agrees, as he must, that if he had in fact killed or arranged for the killing of the witness Bennett, the court could make a finding of manifest necessity for the declaration of a mistrial.[2] He argues, however, that because there was no hearing on this question, no evidence presented other than the Government's representation about what had occurred, and the possibility that Bennett might have been killed by others for other reasons, the court could not assume that appellant was responsible. The purport of this argument is that without an actual showing of the defendant's complicity in the death of the witness, the court could not make a finding of manifest necessity.

We disagree. It would ordinarily be impossible to make an investigation, have a hearing, and permit the introduction of evidence and cross-examination, with some resultant finding based upon whatever standard of proof might be appropriate, see, e. g., Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (upholding the use of the preponderance-of-evidence standard as the burden of proof in a suppression hearing re the voluntariness of a confession), meanwhile suspending the trial in question. It is simply impracticable in the situation of the killing of a key witness to reach any well-founded determination about the true course of events in an hour, a day, a week, or even a month.

The test, therefore, is not whether the defendant was in fact involved in the witness's death, nor even whether under a preponderance of the evidence or some lesser evidentiary standard the court finds it probable that the defendant has participated in the murder. To make such a determination would require a delay in the trial of weeks or even months that would itself ultimately require a mistrial: the jurors' minds would no longer be fresh and, even worse, the

---

2. The defendant's responsibility for reviving the Bruton problem would clearly distinguish the case from United States v. Glover, 506 F.2d 291 (2d Cir. 1974). In Glover the prosecution waited until the fifth day of a joint trial to notify the court that it intended to introduce statements by Glover that presented a Bruton problem with respect to the other defendants. The trial court granted the Government's motion for a mistrial and severance as to Glover and we held that he could not be retried. Insofar as the mistrial was granted for the benefit of the codefendants and the Government, and "Glover had done nothing to bring about the contretemps that resulted in the declaration of a mistrial," 506 F.2d at 297–98, there was not a manifest necessity for ordering the mistrial. If the defendant creates the need for the mistrial and severance, as by killing a witness and necessitating the use of substitute evidence that is inadmissible in a joint trial, Glover does not bar his retrial.

Apart from appellant's possible involvement in the murder, this case differs from Glover in that the prosecution in Glover failed to seek a pretrial ruling on the Bruton evidence, whereas here the prosecution sought such a ruling and was willing to forego the use of the tape in the joint trial because it assumed Bennett would testify. We need express no opinion on whether the prosecution's freedom from fault, absent reason to suspect the defendant was responsible for the witness's unavailability, would alone suffice to make Glover inapplicable and sustain a finding of manifest necessity for a mistrial and severance. Dunkerley v. Hogan, 579 F.2d 141 (2d Cir. 1978), we find distinguishable because there a continuance was a viable alternative. Here the only "viable alternative" suggested was a reversal of the trial court's ruling excluding the Bennett-Mastrangelo tape-recorded conversation, coupled with a redaction of the threats in that conversation. We do not believe that to be as "feasible and practical [a] solution to the problem," id. at 147, as was the alternative of a continuance in Dunkerley. See text, infra.

reasons for the delay might have become evident to one or more of them. Rather, the test must be simply whether at the time the trial judge is faced with the question he reasonably concludes that there is a distinct possibility that the defendant participated in making the witness unavailable, at least where, as here, the Government is totally without fault and the case cannot proceed and the ends of justice be served by the evidence already introduced or otherwise available to the Government. Although the defendant has an important interest in concluding his or her confrontation with society, *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971), the courts are also charged with protecting "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832. *See Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949) (the court should weigh the defendant's "valued right to have his trial completed by a particular tribunal" against the public's interest in "fair trials designed to end in just judgments"). We must not only give due deference to the trial judge's determination, *see Arizona v. Washington; United States v. Grasso,* 600 F.2d at 347, but that determination in favor of the declaration of a mistrial in a case like this—"along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny"—"is entitled to special respect." *Arizona v. Washington,* 434 U.S. at 510, 98 S.Ct. at 833.

We note also that the court here carefully explored and rejected alternatives to a mistrial. The most likely alternative was for the court to reverse its prior decision on the admissibility of the tape-recorded conversation and, using a curative instruction, to attempt to avoid unfairly prejudicing the codefendant, Dazzo. It is always difficult, and sometimes impossible, for a court of appeals, reviewing a cold record of printed words, to measure the likely prejudicial effect of a given piece of evidence in a given trial. The district court's evaluation of events occurring before the jury is, as we said in *Grasso,* 600 F.2d at 343, "to be accorded the highest deference." *See also Arizona v. Washington,* 434 U.S. at 513–14, 98 S.Ct. at 834. As Judge Weinstein observed at the hearing on the double-jeopardy motion below, the court of appeals did not feel "the atmosphere of this courtroom when the jury was dismissed and that the witnesses were obviously under great tension. [It] didn't see the hesitation of these witnesses as they testified." Nor could we observe the effect upon the jury of Ms. Muller's testimony, in response to questioning by Dazzo's attorney, that she "had reasons, what I said to Mr. Haggerty, when he was in my office." We do know that when the Government on redirect asked what those reasons were, Mastrangelo's counsel not only objected but requested a mistrial; the court was very careful to exclude those statements and seek to have the parties stipulate what her answer would have been, namely, that "she did not feel under the circumstances that she wanted to be fully candid with Mr. Haggerty."

Had we been presented with this situation, we might, instead of declaring a mistrial, have reversed our decision not to admit into evidence the taped conversation bearing Mastrangelo's incriminating statements, which after all did not mention Dazzo. But the tape did contain what could be interpreted as a direct threat and, perhaps, a veiled threat against a witness who would not testify. Moreover, with the Government's case against Dazzo essentially completed—a case the judge thought was a "clean" one—we think the judge could properly take into account the public's interest in ensuring that there was neither a mistrial as to Dazzo nor grounds for a retrial at which witnesses who had testified might not be available or willing to testify against him. Acting in an emergency with the Government free from fault, with a distinct possibility that the defendant Mastrangelo was responsible for the killing of the one witness against him, and duly concerned by the threat of prejudice to the codefendant Dazzo (and, indirectly, to the Government's case against Dazzo) from the

admission of the tape with a resultant possible mistrial or new trial as to him, we think the trial judge acted well within the wide discretion afforded him by the double jeopardy cases. We accordingly defer to his judgment about the events occurring before the jury and to his observation of the witnesses, the parties, and the jury itself. To hold otherwise would invade the province of the trial judge for the sake of abstract formality.

Judgment affirmed.

MESKILL, Circuit Judge (dissenting):

The majority reduces the Double Jeopardy Clause of the Fifth Amendment to an "abstract formality" that must yield when a trial judge "reasonably concludes that there is a distinct possibility" that a defendant was responsible for the disappearance of government evidence. Because I believe the Double Jeopardy Clause is not so fragile, I dissent.

This is the type of case which evokes the statement "hard cases make bad law." The majority implicitly recognizes that the record cannot support a finding that appellant Mastrangelo was involved in Bennett's killing "under a preponderance of the evidence or some lesser evidentiary standard[,]" but concludes that no such showing is required. The majority cites no authority, and none exists, for its rule that the Double Jeopardy Clause falls to the trial court's reasonable conclusion that there is a distinct possibility that the defendant participated in the disappearance of government evidence. Instead, my brothers rely on statements in *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978), and *United States v. Grasso*, 600 F.2d 342 (2d Cir. 1979), to the effect that an appellate court must accord substantial deference to a trial court's judgment on manifest necessity. I accept these statements but not the conclusion that they support an affirmance here.

I fully agree that "[a] great deal of discretion must ... be vested in the trial judge, who is usually best situated to determine the degree of necessity for the declaration of a mistrial when an unexpected event occurs during a trial." *Dunkerley v. Hogan*, 579 F.2d 141, 145 (2d Cir. 1978). "This, however, does not end the inquiry .... We must satisfy ourselves that the trial court exercised 'sound discretion.'" *United States v. Grasso*, 600 F.2d at 344 (quoting *Arizona v. Washington*, 434 U.S. at 514, 98 S.Ct. at 835). *See also Dunkerley v. Hogan*, 579 F.2d at 145–48 (holding that the trial judge did not exercise "sound discretion"). *Arizona* taught us that the "strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence ...." 434 U.S. at 508, 98 S.Ct. at 832. Moreover,

in view of the importance of the [defendant's right to have the trial concluded by a particular tribunal], and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

The words "manifest necessity" appropriately characterize the magnitude of the prosecutor's burden.... Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.

*Id.* at 505–06, 98 S.Ct. at 830–31 (footnotes omitted).

The majority, in permitting the protections of the Fifth Amendment to be defeated by a reasonable conclusion that there is a "distinct possibility" that the defendant was somehow connected with the disappearance of government evidence, ignores the "heavy burden" and "high degree" standards enunciated in *Arizona*. The crux of the majority opinion is that it would be

"impracticable in the situation of the killing of a key witness to reach any well-founded determination about the true course of events . . . ." It may well be impracticable to make such a determination, but I cannot accept the conclusion in this case that impracticability justifies relieving the government of its "heavy burden" to show that the denial of an important constitutional protection is highly necessary.

The majority is properly concerned with "society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws." *Arizona v. Washington*, 434 U.S. at 509, 98 S.Ct. at 832. It has long been the rule that the trial court should weigh the defendant's "valued right to have his trial completed by a particular tribunal" against society's interest in "fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). But in *United States v. Glover*, 506 F.2d 291 (2d Cir. 1974), this Court weighed similar facts and concluded that the Double Jeopardy Clause barred reprosecution. The majority's tortured analysis of the standard of proof for finding that Mastrangelo was involved in the killing of a witness is designed to distinguish this case from *Glover*.

Like the instant case, *Glover* involved the declaration of a mistrial in a multidefendant trial. Glover was tried jointly with three codefendants for conspiracy to violate the federal narcotics laws. After almost five days of trial, the government informed the court that it intended to introduce evidence of admissions by Glover. The judge immediately recognized that this evidence might not be admissible against Glover's codefendants and asked all parties to brief and argue the issue. After considering the arguments, the judge ruled that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny prohibited introduction of the proffered evidence against Glover's codefendants. He then granted the government's motion for severance of Glover and declared a mistrial as to Glover.

Glover moved to dismiss the indictment on the ground that a subsequent trial would violate his right to protection against double jeopardy. The trial court denied this motion and Glover was tried and convicted. On appeal, this Court held that Glover's motion to dismiss should have been granted because the declaration of a mistrial as to him was not supported by manifest necessity. "The rationale of *Glover* was that retrial violated the Double Jeopardy Clause because it did not provide the involuntarily severed defendant with any advantage, but merely helped his codefendants and the Government." *United States v. Figueroa*, 618 F.2d 934, 944–45 n.6 (2d Cir. 1980).

It cannot seriously be contended that the declaration of a mistrial in the instant case was for the benefit of Mastrangelo. The government concedes that had the trial continued without introduction of the tape, it would have been unable to present even a *prima facie* case against Mastrangelo. As in *Glover*, the trial court here declared a mistrial to protect a codefendant from prejudice without diminishing the government's chances of obtaining a conviction against the severed defendant. *Glover* controls the instant case and requires reversal of the trial court's finding of manifest necessity.

Had the trial court lacked reasonable alternatives to declaring a mistrial, I would agree that manifest necessity existed and that *Glover* would not control.[1] But this

---

1. In addition to distinguishing *Glover* on the ground that Mastrangelo can be held responsible for Bennett's death, the majority suggests that *Glover* might also be distinguished because the government could easily have avoided the mistrial in that case by acting more carefully. The majority implies that it is an open question whether the absence of prosecutorial misconduct or error will vitiate a double jeopardy claim when a mistrial was declared over the defendant's objection, even when the defendant did not cause the problem that precipitated the mistrial.

In *Dunkerley v. Hogan*, 579 F.2d 141 (2d Cir. 1978), this Court held that the Double Jeopardy Clause barred retrial of a defendant following the declaration of a mistrial prompted by the hospitalization of the defendant with a partially collapsed lung. This Court ruled that the mistrial was not supported by manifest necessity

was not the case. The trial court could have reversed its ruling on the admissibility of the taped conversation between Mastrangelo and Bennett, protecting against prejudice to Dazzo either by redacting the allegedly threatening portions of the conversation or by giving a curative instruction to the jury. The majority recognizes this as a reasonable alternative and even suggests that it would have preferred this option. Once again, however, the majority retreats behind the statement that the trial court's decision must be accorded "the highest deference." In doing so, the majority ignores the fact that "the basis for the mistrial [was] the unavailability of critical prosecution evidence . . . ." *Arizona v. Washington*, 434 U.S. at 508, 98 S.Ct. at 832. Thus, in evaluating the trial court's exercise of discretion, "the strictest scrutiny is appropriate . . . ." *Id.* The majority's search for reasons to affirm the trial court's ruling is plainly inconsistent with the strict scrutiny that *Arizona* prescribes.

The fact that the case against Dazzo was strong and essentially complete should not diminish Mastrangelo's right to have his trial concluded before his first jury when it is not even arguable that the mistrial was for his benefit and when there is no reasonable basis for concluding that he caused the government's evidence to disappear.

I believe that when viable alternatives to declaring the mistrial are available, and when the mistrial is neither for the defendant's benefit nor demonstrably caused by the defendant, a court should be slow to reject the protections of the Double Jeopardy Clause. This is especially true when the court is confronted with the conflicting interests of codefendants. As Judge Gurfein wrote for this Court in *Glover*:

> a permissive attitude toward mistrials in multiple defendant conspiracy cases could lead to an erosion, bit by bit, of the double jeopardy provision—an undesirable result . . . .

because a continuance could have been granted for the 7 to 10 days during which the defendant was expected to be hospitalized. There was no suggestion that either the defendant or the government was in any way responsible for creating the need for the mistrial.

506 F.2d at 298. I believe that the majority opinion is a substantial step in that erosion.

Therefore, where viable alternatives are available, the absence of prosecutorial misconduct or error should not alone defeat a subsequent double jeopardy claim.