**UNITED STATES of America,**

v.

**Angelo RUGGIERO, et al, Defendants.**

**No. CR 83–412(S).**

United States District Court,
E.D. New York.

Jan. 25, 1988.

Andrew J. Maloney, U.S. Atty., Laurence Urgenson by Robert Larusso, John Gleeson, Asst. U.S. Attys., and Jack Shannon, Sp. Asst. U.S. Atty., Brooklyn, N.Y., for U.S.

Jeffrey Hoffman, New York City, for defendant Ruggiero.

Ronald Fischetti, New York City, for defendant Gotti.

Anthony Lombardino, Kew Gardens, N.Y., for defendant Carneglia.

Edwin Schulman, Pittsford, N.Y., for defendant Moscatiello.

Robert Katzberg, New York City, for defendant Lino.

Benjamin Brafman, New York City, for defendant Reiter.

Dave Depetris, New York City, for defendant LoPresti.

David Lewis, New York City, for defendant A. Gurino.

Robert Fogelnest, New York City, for defendant C. Gurino.

Martin Geduldig, Garden City, N.Y., for defendant Ansourian.

---

MEMORANDUM OF DECISION
AND ORDER

COSTANTINO, District Judge.

Trial of this case, which involves charges of Racketeering, Distribution of Heroin, Obstruction of Justice and Conspiracy to Obstruct Justice, commenced in April 1987, when an anonymous jury was empaneled. Opening statements began on June 1, 1987. On October 22, 1987, the Government began an investigation, necessitated by information obtained from confidential sources, to discover whether the jury sitting in this case had been compromised. On January 8, 1988, the Government brought the fruits of its investigation to the court's attention and requested that the Court conduct an *in camera voir dire* of each juror and a hearing to determine if unlawful contact with the jurors had, in fact, occurred.

Confronted with the seriousness and the immediacy of the information presented by the Government, the Court granted the Government's request and interviewed each juror in chambers without first notifying the defendants. The next day, defense counsel was presented with a transcript of the *voir dire* and the Government's motion papers. Over the following three days, the Court conducted hearings in order to determine the merits of the Government's allegations. At the conclusion of the hearings, the Government moved for a mistrial and on January 22, the Court granted the motion. The following constitutes this Court's findings with respect to the Government's motion.

At the outset, it is important to note that the defendants' assertion that the Government bears the burden of establishing by a preponderance of the evidence that jury tampering has occurred is incorrect. In a case similar to the one at bar, where the trial court "understandably believed" that the defendant was responsible for the death of a crucial Government witness, the Court of Appeals for the Second Circuit stated:

"the test [is] simply whether at the time the trial judge is faced with the question he reasonably concludes that there is a distinct possibility that the defendant participated in making the witness unavailable, at least where ...the Government is totally without fault and the case cannot proceed and the ends of justice be served ..."

*United States v. Mastrangelo,* 662 F.2d 946, 952 (2d. Cir.1981).

Although the Government also urges this Court to make its findings based on the more rigorous preponderance standard, the Court will not accept the invitation. In light of the exigency of determining whether to proceed with the trial and the obvious constraints placed upon the Court's ability to fully explore the Government's allegations at a short hearing, the Court can perceive no reason to depart from the standard enunciated in *Mastrangelo.* The fact that the Government had more time to investigate the defendants' misconduct than it did in *Mastrangelo,* is of limited significance, for it is the Court that must make the expeditious determination of whether the trial may go forward in the face of the Government's assertion (and the defendants' vehement denials) that jury tampering has occurred. *Id.* at 951–952.

The defendants are also incorrect in their assertion that "the jurors' answers to the Court's *voir dires* are conclusive and absolutely preclude a finding by the Court that jury tampering has occurred." (Defendants' Joint Memorandum, p. 23). *Irvin v. Dowd,* 366 U.S. 717, 725, 81 S.Ct. 1639, 1644, 6 L.Ed.2d 751 (1960); *Sullivan v. Fogg,* 613 F.2d 465, 467 (2d Cir.1980). If the Court believed that the *voir dire* resolved the Government's allegations, the inquiry would have ended there. The *voir dire* did not solve the issue to the court's satisfaction, however, and the additional proceedings were clearly warranted.

Both the Government and the defendants have set forth extensive reviews in their submissions of the evidence that was adduced at the trial, presumably so that the Court could determine whether the defendants had a motive to tamper with the jury. The defendants also present their interpretation of the trial evidence to bolster their claim that the Government acted in bad faith in bringing its mistrial motion. This

latter point is clearly a question for a future proceeding (however, the Court fully adopts the January 22, 1988 opinion of the *en banc* panel on this issue [1]).

In regard to whether the evidence introduced at trial provided the defendants with a motive to tamper with the jury, the Court will not pass on the weight of the trial evidence. A judicial endorsement of the Government's case could significantly prejudice the defendants at subsequent trial. The Court does find, however, that the charges and the possible sentences faced by the defendants if they were convicted provided the defendants with ample motive to tamper with the jury.

Based upon the evidence adduced at the hearing and the materials submitted by the Government, the Court finds that there is a very high degree of likelihood that the panel sitting on this case has to some extent been compromised as a result of unlawful conduct circumstantially attributable to the defendants.

In an affidavit dated January 7, 1988, Special Agent Martin J. Towey states that he has been advised by Special Agent Robert J. Liberatore that the Federal Bureau of Investigation ("F.B.I.") has received information from confidential sources regarding jury tampering in this case. Specifically, Agent Towey advises that:

[3]. a. Beginning in the summer of 1987, the defendants in this case began to take overt measures to identify members of the anonymous jury in order to fix the case. Specifically, the plot was engineered by John Carneglia, Gene Gotti, Angelo Ruggiero and Eddie Lino.

b. The defendants have learned the identities of at least five of the jurors.

c. Initially, the defendants used the services of William Sewell, an investigator, to help identify members of the jury. Sewell's services included having computer searches conducted to trace the license plates of cars in which the jurors were observed.

d. At least one of the black jurors has been approached and is now compromised. (footnote omitted).

Towey Aff. pp. 2–3.

Although standing alone this hearsay information might be considered too attenuated for the Court to make a finding of jury tampering, testimony adduced at the hearing provides potent corroboration of Towey's statements. For example, former juror number two, Gary Barnes, served on the panel until December 8, 1987. He was discharged on that date after it was learned that he was not a United States citizen and was therefore not qualified to serve as a juror. (28 U.S.C. § 1865 (b)(1)). Mr. Barnes was the Government's first witness at the hearing. The Court finds Barnes to be a completely trustworthy witness, and it credits his testimony in its entirety. At the hearing, Barnes testified that he is employed at REFCO, Inc. as a commodities telephone clerk. (Tr. 10210 [2].). Barnes identified a photograph, marked as Government exhibit 4, as a person he observed in courtroom on several occasions. (Tr. 10224). Exhibit 4 is photograph of William Sewell, the private investigator named in the Towey affidavit and in the affidavit of Special Agent John Flanagan. Barnes observed Sewell on one occasion in the municipal parking lot used by several of the jurors. (Tr. 10227). At that time,

---

1. The *en banc* panel found:

(1) The grand jury proceedings investigating possible jury tampering in *United States v. Angelo Ruggiero* were appropriate and bona fide.

(2) There was good reason for the United States Attorney to have brought to trial judges' attention the possibility of jury tampering.

(3) Any publicity arising from the United States Attorney's application, which may have come to the attention of some jurors and resulted in their doubting their ability to decide the case fairly was not due to the fault of the United States Attorney.

. . . .

Findings (1), (2) and (3) are made on record now before us without prejudice to any contrary findings on the basis of any evidence, hearings and argument which may be advanced before the judge assigned to supervise this case should the judge deem it necessary to amplify or clarify the record in any respect.

2. Citations marked "TR" to the hearing transcript.

they had a brief verbal interchange which was initiated by Barnes. Although the defendants have painted this conversation as "utterly innocuous" (Defendants' Joint Memorandum, p. 32), the Court does not agree with this characterization. The import of Barnes's testimony and the significance of his question—"Are you a chauffeur?"—is that Barnes was curious about why Sewell had followed him into the garage.

The defendants also make much of the fact that Sewell truthfully told Barnes that he was a private investigator in response to Barnes's question[3]. It would bespeak ill of Sewell's skills as an experienced investigator and former New York City detective, however, if he responded untruthfully with an answer that could be so easily verified that it might unveil the defendants' stratagem in an instant.

3. The defendants also place much reliance on Sewell's statements to the grand jury that he was not retained by the defendants in this case and that he has not taken steps to identify jurors in this case. It would not be surprising if Sewell was less than candid in these statements, however, given his acknowledged closeness to the Gotti family and Angelo Ruggiero. *See generally* Grand Jury testimony of William Sewell.

4. A transcript of this conversation was introduced at the hearing as Government Exhibit 2A. It provides:

Ben Lopez: REFCO Sugar
MR: Benny?
Ben: Yes?
MR: Is GARY around?
Ben: GARY BARNES?
MR: Yeah.
Ben: Yeah sure, one sec.
MR: Mr. BARNES?
GB: Yeah, yes sir.
MR: I like the way you say that.
GB(?): (Laugh)
MR: What are you doing later?
GB: What am I doing later, who's this?
MR: MEL.
GB: MEL?
MR: Yeah.
GB: MEL from, ah ...
MR: MEL at REFCO.
GB: Yeah?
MR: Stop by later, I want to talk to you.
GB: What about?
MR: Doesn't matter! Stop by.
GB: No, you have to let me know. What time later?
MR: Whenever you got time.

The information obtained from the confidential sources is also substantiated by the events which transpired shortly after Mr. Barnes was discharged from the jury on December 8. On December 9, Special Agent Flanagan telephoned Barnes and arranged an interview for the afternoon of the next day. (Tr. 10235). On December 10, at 10:45 A.M., prior to his meeting with Flanagan, Barnes received a telephone call from Melvin Rosenberg. Rosenberg is also employed by REFCO. That conversation was recorded at REFCO in the regular course of business and was replayed during the hearing[4]. It is patent from this conversation that: (1) Barnes did not recognize the speaker until Rosenberg identified himself several times, (2) Rosenberg was very serious about his need to meet with Barnes, and (3) Rosenberg believed that the subject matter of his planned meeting with Barnes could not be stated on a taped

GB: Whenever I have time.
MR: I'll be around. What time do you leave the floor, GARY, 2:30?
GB: Well, I'm leaving early today.
MR: Where you going?
GB: Uh?
MR: Where you going?
GB: Let me know what you want to talk to me about!
MR: No, no, no, not on the phone. I want to talk to you.
GB: You want ... I tell you what, can I call you back from the pay phone?
MR: I won't speak to you on the phone.
GB: Uh?
MR: I won't speak on the phone. This phone is taped here.
GB: I know, but I can call you back when the tape ...
MR: My phone is taped!
GB: Oh, you're taped, you phone is taped also?
MR: Yeah, I'm taped.
GB: Oh, can you go to another phone that's not taped?
MR: No! Try and come back here.
GB: Ah ...I'll try.
MR: What time do you leave? You're leaving what time?
GB: Oh, I could walk over there at least 2:30, quarter to three. What time are you leaving?
MR: I'll be here.
GB: Alright.
MR: Ok?
GB: I'm kind of curious, what's the matter?
MR: No, I gotta talk to you.
GB: Yeah, alright, no problem.
MR: Alright
(Call ends)

telephone. This latter point is especially noteworthy, for it evinces that Rosenberg knew that his contact with Barnes was prohibited. It also undermines the defendants' suggestion that Rosenberg thought Barnes was no longer a sitting juror when he contacted him.

Rosenberg's subsequent meeting with Barnes further substantiates the confidential sources' information. Specifically, Barnes related that Rosenberg said that he knew Barnes was on a jury, that he (Rosenberg) was friends with one of the defendants in that trial, and that the defendant he was friends with was Gene Gotti. Rosenberg also told Barnes that he had been a friend of the Gotti family for over forty years and that he knew Gotti's three daughters. Rosenberg then pressed Barnes for information about what the jury's inclinations were and suggested that a new B.M.W. automobile would be Barnes's remuneration if Barnes would divulge the information. Barnes steadfastly refused to acknowledge Rosenberg's statements and when the bribe was tendered, Barnes told Rosenberg that he didn't know what he was talking about and left the room. (Tr. 10250).

On December 22, 1987, Rosenberg was interviewed by Agent Flanagan. Rosenberg stated that his approach of Barnes was a "lark," that his acquaintance with Barnes was akin to a father/son relationship, and that he did not know Gene Gotti personally but that he knew Gotti's name from the newspapers. Flanagan Aff. pp. 23–4.

Several conclusions may be gleaned from Rosenberg's contact with Barnes and his subsequent statements to Agent Flanagan. First, it is apparent that his contact with Barnes was not done as a "lark," but in full earnestness. That fact is clear from the initial telephone conversation and Barnes's testimony. (Tr. 10246). Second, Rosenberg lied to Agent Flanagan when he stated that he and Barnes had a father/son relationship. This statement is contradicted by the very credible testimony of Mr.

Barnes who stated that Rosenberg was only someone he would acknowledge in the hall from time to time. (Tr. 10241–2). Rosenberg also lied to Agent Flanagan when he stated that he only knew Gene Gotti's name from the newspaper. It is inconceivable that Rosenberg would tell Barnes that he was a friend of the Gotti family for over forty years, that he knew Gene Gotti and his three daughters,[5] that he would engage in conduct that he apparently recognized as unlawful and offer Barnes a substantial reward had he not had more than an offhand knowledge of Gene Gotti. It is evident to the Court, based on Rosenberg's statements and actions, that he was acting on behalf of Gene Gotti when he contacted Gary Barnes.

There is additional circumstantial evidence that ties Rosenberg to Gotti. At the conclusion of his interview with Rosenberg Agent Flanagan served Rosenberg with a grand jury subpoena. In arranging legal representation for his upcoming grand jury appearance, Rosenberg contacted Charles Carnesi, Esq., the attorney who employed William Sewell and who represented Sewell during his grand jury appearance. (Tr. 10370–1; Government exhibits 12A, 13A). The Court finds that in the face of all the facts that have come to light during the hearing, it is highly unlikely that Rosenberg's connection to Carnesi and Sewell and thus, to Gene Gotti is mere happenstance.

Based on the foregoing, the Court finds that there is a manifest necessity to declare a mistrial in this case due to the defendants' efforts to improperly identify and influence the jury. *See e.g. Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United States v. Mastrangelo*, 662 F.2d at 951 n. 2.

The Court also finds that there is manifest necessity for the declaration of a mistrial because there is an insufficient number of jurors who can deliberate fairly and impartially.

During the *voir dire* of the jury, three jurors—numbers four, eight and twelve

---

5. Indeed, it is unlikely that Rosenberg would know that Gotti had three daughters if he only knew Gotti's name from the newspapers. (Gotti does in fact have three daughters. Tr. 10385).

**51**

stated that they could no longer remain fair and impartial. (Tr. 10445, 10452–3, 10462–3, 10464–6). The Court believed these jurors' statements, and they were therefore dismissed for cause. *See Irwin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960); *United States v. Gigante,* 729 F.2d 78 (2d Cir.), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1983). At the time jurors four, eight and twelve were dismissed, two alternate jurors remained on the panel. There was, therefore, an insufficient number of jurors with which to proceed, and the Court had no alternative but to declare a mistrial.

The parties are directed to appear before Chief Judge Weinstein on January 27, 1988 at 9:30 A.M.

SO ORDERED.