UNITED STATES of America, Appellee,

v.

Angelo RUGGIERO, Gene Gotti, John Carneglia, Edward Lino, Mark Reiter, Joseph LoPresti, Anthony Moscatiello, Oscar Ansourian, Anthony Gurino, and Cesar Gurino, Appellants.

Nos. 1075–82, 1092–93, Dockets 88–1083–88, 88–1090–91, 88–1098 and 88–1102.

United States Court of Appeals, Second Circuit.

Argued April 8, 1988.

Decided April 26, 1988.

**118**

Gerald L. Shargel, New York City, for appellant Carneglia (Christine E. Yaris, New York, N.Y.; Jeffrey Hoffman, Todtman, Hoffman, Epstein, Young, Goldstein, Tunick & Pollok, P.C., New York City, for appellant Ruggiero; Ronald P. Fischetti, Fischetti & Pomerantz, New York City, for appellant Gotti; Robert Katzberg, Kaplan & Katzberg, New York City, for appellant Lino, of counsel), arguing for appellants Ruggiero, Gotti, Carneglia and Lino.

David L. Lewis, Lewis & Fiore, New York City, for appellants Anthony and Cesar Gurino (Edwin Schulman, Kew Gardens, for appellant Moscatiello; Martin Geduldig, Garden City, for appellant Ansourian; David DePetris, DePetris & Meyers, New York City, for appellant LoPresti; Barry Slotnick, Slotnick & Baker, New York City, for appellant Mark Reiter; Joseph Calluori, of counsel), arguing for appellants Anthony and Cesar Gurino, Moscatiello, Ansourian, LoPresti and Reiter.

John Gleeson, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty. for E.D.N.Y., David C. James, Asst. U.S. Atty., of counsel), for appellee.

Before LUMBARD, OAKES and MINER, Circuit Judges.

OAKES, Circuit Judge:

Ten defendants, following a declaration of mistrial, appeal from the denial of their motion to bar a retrial on double jeopardy grounds. The defendants—Angelo Ruggiero, Gene Gotti, John Carneglia, Edward Lino, Mark Reiter, Joseph LoPresti, Anthony Moscatiello, Oscar Ansourian, Anthony Gurino, and Cesar Gurino—were tried in the United States District Court for the Eastern District of New York, Mark A. Costantino, Judge, on charges of narcotics trafficking, obstruction of justice, racketeering, and operating a continuing criminal narcotics enterprise.[1] Judge Costantino declared a mistrial because he found that the defendants had attempted to identify and influence the jury and that the dismissal of three biased jurors left an insufficient number of jurors to try the case. Assigned the case after the mistrial, Judge Joseph M. McLaughlin relied heavily on Judge Costantino's opinion and concluded that the showing of a manifest necessity for the mistrial avoided a double jeopardy bar to a subsequent prosecution. We affirm.

## BACKGROUND

A twelve-count superseding indictment charges Angelo Ruggiero, Gene Gotti, and John Carneglia with engaging in a continuing criminal narcotics enterprise in violation of 21 U.S.C. § 848 (1982 & Supp. IV 1986). In addition, it charges all defendants with conspiracy to violate the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(d) (1982), and with various other charges relating to narcotics trafficking and the obstruction of a grand jury investigation. Trial commenced before Judge Costantino and an anonymous jury on June 1, 1987.

In October 1987, the United States Attorney learned that the Federal Bureau of Investigation (FBI) had received information from confidential sources that the defendants had identified members of the anonymous jury for the purpose of influencing the verdict. Specifically, the Government discovered that defendants John Carneglia, Gene Gotti, Angelo Ruggiero, and Edward Lino had employed William Sewell, a private investigator, to trace the license plates of suspected jurors. After Sewell had a falling out with these defendants, they used a different investigator, Victor Juliano. The confidential information indicated that the defendants had learned the identities of at least five of the jurors and that one of the black jurors had been approached "and [was] now compromised." FBI investigators also learned that Juror No. 4, who was one of the few jurors who parked near the courthouse, owned a car with a "vanity" license plate consisting of his first initial and full last

---

1. The indictment in this case named an eleventh defendant, Joseph Guagliano. Guagliano's family reported him missing in February of 1986, according to an FBI affidavit.

name. After finding Juror No. 4's address in a Queens, New York, telephone book, the FBI investigators determined that he lived approximately five doors away from two men whom they suspected of engaging in organized criminal activities, often in association with the defendants.

This information prompted a grand jury investigation into the allegations of jury tampering. On December 8, 1987, while the grand jury investigation was proceeding, Gary Barnes, Juror No. 2, was excused from the jury because it was discovered that he was not a United States citizen. Two days later, Barnes told FBI Special Agent John Flanagan that a co-worker, Mel Rosenberg, had telephoned him that morning and arranged to meet him.[2] According to Barnes, Rosenberg indicated he believed Barnes was a juror in the case, said he was a friend of defendant Gene Gotti, and offered Barnes a new BMW car in exchange for information about how the jury was "feeling."

On December 22 at 7:20 a.m., Agent Flanagan questioned Rosenberg at his home. Rosenberg admitted calling Barnes but said that it was a joke, a "lark." He denied that he ever mentioned the initials "G.G." or the name "Gene Gotti." He told the FBI agent that the only attorneys he knew were his brother-in-law and his own attorney, Brian Levinson. At the end of this interview, Agent Flanagan served Rosenberg with a subpoena to appear before the grand jury the next day. Rosenberg said that he would be there.

According to tape recordings of telephone calls made from Rosenberg's office, two hours later he called a person named Anthony and said, "Yeah, listen, I don't have his number. I've got to speak to him." Anthony asked, "Who?" Rosenberg said, "You know." When Anthony asked what was the matter, Rosenberg said he could not talk about it on the telephone. Within the hour, he made a call to an unknown person identified as "Big A," again trying to contact "him." He told "Big A" that it was very important, that he was in trouble but that he could not talk about it on the phone. In a 3:30 p.m. telephone conversation between Rosenberg and an unidentified male, Rosenberg indicated that he had to meet with an attorney.

2. Because Barnes and Rosenberg both worked at REFCO where all telephone calls are routinely recorded, the FBI was able to obtain a transcription of their December 10 conversation, part of which follows:

Rosenberg: What are you doing later?
Barnes: What am I doing later, who's this?
Rosenberg: Mel.
Barnes: Mel?
Rosenberg: Yeah.
Barnes: Mel from, ah ...
Rosenberg: Mel at REFCO.
Barnes: Yeah?
Rosenberg: Stop by later, I want to talk to you.
Barnes: What about?
Rosenberg: Doesn't matter! Stop by.
Barnes: No, you have to let me know. What time later?
Rosenberg: Whenever you got time.
Barnes: Whenever I have time.
Rosenberg: I'll be around. What time do you leave the floor, Gary, 2:30?
Barnes: Well, I'm leaving early today.
Rosenberg: Where you going?
Barnes: Uh?
Rosenberg: Where you going?
Barnes: Let me know what you want to talk to me about!
Rosenberg: No, no, no, not on the phone. I want to talk to you.
Barnes: You want ... I tell you what, can I call you back from the pay phone?
Rosenberg: I won't speak to you on the phone.
Barnes: Uh?
Rosenberg: I won't speak on the phone. This phone is taped here.
Barnes: I know, but I can call you back when the tape ...
Rosenberg: My phone is taped!
Barnes: Oh, you're taped, your phone is taped also?
Rosenberg: Yeah, I'm taped.
Barnes: Oh, can you go to another phone that's not taped?
Rosenberg: No! Try and come back here.
Barnes: Ah ... I'll try.
Rosenberg: What time do you leave? You're leaving what time?
Barnes: Oh, I could walk over there at least 2:30, quarter to three. What time are you leaving?
Rosenberg: I'll be here.
Barnes: Alright [sic].
Rosenberg: Ok?
Barnes: I'm kind of curious, what's the matter?
Rosenberg: No, I gotta talk to you.
Barnes: Yeah, alright [sic], no problem.
Rosenberg: Alright [sic].
(Call ends.)

At 4:02 p.m., Rosenberg called attorney Brian Levinson and told the woman who answered that "Charlie Carnesi" would be calling on Rosenberg's behalf. At 4:26 p.m. Charles Carnesi called Rosenberg to tell him that he, Carnesi, had not "been able to get in touch with him yet." Three minutes later, Brian Levinson returned Rosenberg's call. Rosenberg said that "Charlie" was trying to get in touch with Levinson. He added that Carnesi would "lay out the groundwork" for Levinson for "this thing . . . for tomorrow morning at 10 a.m.," the exact return date and time of Rosenberg's subpoena.

On January 7, 1988, the Government presented Judge Costantino with the evidence of jury tampering and requested the court conduct an in camera voir dire of each juror. The Government also requested the court to hold an evidentiary hearing which would be closed to the public. Attached to the Government's memorandum in support of its motion were affidavits of FBI Special Agents John Flanagan and Martin A. Towey which described the information from confidential sources suggesting jury tampering as well as past reports that four of the principal defendants, Ruggiero, Gotti, Carneglia, and Ansourian, had tampered with judicial and law enforcement processes.

On Monday, January 11, 1988, Judge Costantino conducted seriatim a voir dire of the jurors as requested by the Government in chambers and without the presence of the lawyers. With the exception of Juror No. 11, who stated that a person at work had indicated that he knew that she was on Angelo Ruggiero's jury, none of the jurors said that they had been approached. The next day, a transcript of the voir dire and the Government's papers were turned over to defense counsel. The Government reneweа its request for closure and notified the court and the defendants that, based on inquiries that the United States Attorney's office had received, the press was already aware of the general nature of the proceedings. The defense joined the Government in its motion to close the hearing to the public. When the court declined to rule on the issue of closure, the Government moved to sequester the jury. The defendants opposed sequestration. That night, a television news story about the jury-tampering allegations was aired. Nevertheless, on the morning of January 13, the court denied the Government's motion for closure. The Government immediately renewed its motion for sequestration of the jury. The court, "reserv[ing] decision on sequestration . . . pending the hearing," commenced a hearing on the jury-tampering issue in open court.

The first witness was Gary Barnes, the juror who had been excused because he was not a United States citizen. Barnes testified that he had seen a man later identified as William Sewell sitting in the courtroom during the trial. He remembered seeing him once for three days in a row, and on another occasion speaking with Ronald Fischetti, Gene Gotti's attorney. Barnes testified that he once encountered Sewell in the municipal parking garage near the courthouse. Barnes was walking with a fellow juror, about one hundred feet into the garage, when he noticed that Sewell had come up behind him, "literally side by side, like walking pretty fast." Barnes testified that when he recognized Sewell as the man he had seen in the courtroom, he asked Sewell who, like himself, was black, "What are you, chauffeur?" Sewell, who appeared offended by the question, replied, "No, I am a private investigator," and "kept going." Barnes and the other juror then went to the lower level of the parking garage where the other juror had parked her car. Sewell's car was parked up above.

Barnes also described his encounter with Mel Rosenberg. He testified that on December 10, his first day at work following his excusal from the jury, he received a telephone call from Rosenberg. Although he and Rosenberg had worked in the same office at REFCO, Inc., a commodities brokerage firm, for four or five months in 1982, Barnes said they were not close friends. In fact, since January 1983 when Barnes became a commodities telephone clerk, the only contact between the two men had been casual exchanges in the hallway and one or two telephone calls when

Rosenberg called to place an order. Consequently, Barnes considered Rosenberg's telephone call "unusual." He testified that Rosenberg asked him to come to his office that afternoon, the same afternoon Barnes had promised to meet an FBI agent. When Barnes arrived, Rosenberg interrupted the telephone call that he was making. Barnes asked Rosenberg what he wanted to talk about, but Rosenberg did not respond. He led Barnes to a small conference room and closed the door. Barnes again asked him what he wanted to talk about. According to Barnes's testimony, Rosenberg said, "[T]here is a case in Queens. It has been going on for quite some time, right, and I know this kid. This kid is a very good friend of mine. I have known him for 42 years." Barnes said he told Rosenberg that he was not on jury duty in Queens but in Brooklyn. Rosenberg continued, "I know this kid for a long time and I just wanted to know how the jury is feeling." Barnes again repeated that he was in Brooklyn and did not know what Rosenberg was talking about. At that point in the conversation, Rosenberg said, "I am just going to give you initials, right, and this case is about drugs.... Initial is G.G." Barnes reiterated that he was not on a jury in Queens. Rosenberg said, "Okay, okay, Gene Gotti." Again Barnes said, "I don't know what you are talking about. I am not in Queens." Rosenberg said,

> I have known this kid for 42 years. I have known his family. We are good friends. I know his three daughters and everything. I just want to know what the jurors are thinking. I know this guy is probably going to get convicted, going to go to jail.... [T]he Government is probably going to try to put this guy away for a long time because of his brother.

Rosenberg then mentioned a new BMW and asked him what kind of car he drove. Barnes said that he did not need a car and walked out of the room. Barnes testified that he had not seen Rosenberg during the trial, and that he had not told him he was on the Gene Gotti case or that he had been excused from jury duty. Nor did he ask how Rosenberg knew he was on the jury.

When the hearing continued the next day, January 14, FBI Special Agent Flanagan testified summarizing the information received from confidential sources and from his interviews with Barnes, Rosenberg, and Sewell. He reported that Rosenberg had claimed that he and Barnes were extremely close, as if they were father and son. The jury was sequestered that night. The next morning, FBI Special Agent Towey testified. Later that day Judge Costantino held a voir dire of the jury in open court. Three jurors stated that they could no longer be impartial. Juror No. 4 was not sure whether his parents' fear would affect his judgment. Juror No. 8 admitted that he had learned that there were allegations of jury tampering and that family experiences prevented him from being impartial about the drug charges which were more important to the case than he had originally thought. Juror No. 12 stated she was not sure that she could remain impartial because she had "put pieces together." [3]

On January 19, the first working day after the hearing had ended, the Government moved for a mistrial, urging Judge Costantino to make the following findings: that the proof presented during the trial, particularly of the narcotics charges, was overwhelming; that the Government had acted responsibly in commencing and conducting the jury-tampering proceedings; and that there was a manifest necessity for a mistrial because (1) an insufficient number of qualified jurors remained to continue with the case, (2) the evidence had established that the defendants had tampered with the jury, and (3) there were no adequate alternative forms of relief that could ensure a fair trial. On January 21, the defendants filed a post-hearing memorandum, expressing their agreement that circumstances "necessitated [the] dismissal" of Jurors 4, 8, and 12.

Later that day the United States District Court for the Eastern District of New York

---

3. A fuller interrogation of each is attached hereto as Appendix A.

convened en banc to consider whether the United States Attorney had made charges of jury tampering to create conditions necessitating a mistrial because he thought the evidence was favorable to the defendants.[4] The en banc court, after reviewing the jury-tampering proceedings before Judge Costantino and the grand jury proceedings, found that the grand jury proceedings were bona fide and appropriate and that there was good reason for the United States Attorney to have brought the possibility of jury tampering to the trial judge's attention. The court observed that "[a]ny publicity arising from the United States Attorney's application, which may have come to the attention of some jurors and resulted in their doubting their ability to decide the case fairly was not due to the fault of the United States Attorney." The en banc court concluded that the question whether and when to order a mistrial was properly left to the trial judge.

On January 25, 1988, after reading the opinion of the en banc court to the parties, Judge Costantino declared a mistrial. Relying upon *United States v. Mastrangelo,* 662 F.2d 946, 952 (2d Cir.1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed. 2d 847 (1982), the judge found "that there is a very high degree of likelihood that the panel sitting on this case has to some extent been compromised as a result of unlawful conduct circumstantially attributable to the defendants," creating a manifest necessity for a mistrial. Specifically, the court concluded that the testimony at the hearing corroborated the confidential information reported by the FBI agents. Crediting Barnes's testimony in its entirety, the court found that Mel Rosenberg's contact with him was "not done as a 'lark,' but in full earnestness." Noting that Rosenberg

had said that he was a friend of Gene Gotti and that Gotti had three daughters, and that in arranging legal representation for his grand jury appearance, he had contacted Charles Carnesi, the attorney who had employed William Sewell and who had represented Sewell during his grand jury appearance, the court concluded that Rosenberg "was acting on behalf of Gene Gotti when he contacted Gary Barnes."

Judge Costantino also noted that three jurors said that they could no longer be impartial. The court, believing their statements, had dismissed them for cause, which the court noted left it with "no alternative but to declare a mistrial." Neither the court, the Government, nor defense counsel looked into the possibility under Fed.R.Crim.P. 23(b) of continuing with eleven jurors.

Following the mistrial declaration, the case was reassigned to Judge Joseph M. McLaughlin, who severed the case into four parts. The Government then moved to revoke the pretrial release of Gene Gotti. Judge McLaughlin denied the motion because he found insufficient proof that Gotti actually hired Rosenberg or authorized his action. The defendants then moved to bar a retrial on double jeopardy grounds, arguing that the evidence did not indicate that the defendants had tampered with the jury or that there was an insufficient number of impartial jurors. In contrast to their position before Judge Costantino, the defendants now argued that Jurors 4 and 12 could have been kept. Judge McLaughlin denied the motion on the basis that it was within Judge Costantino's discretion to apply the "distinct possibility" standard of proof endorsed in *Mastrangelo* to the jury-tampering facts, to assess the credibility of wit-

---

4. 28 U.S.C. § 132(c) (1982) provides that federal judges shall sit singly "[e]xcept as otherwise provided by law, or rule or order of court." This section "expressly permits and sanctions the pre-Code practice followed in some districts where the district judges sat en banc to resolve questions of importance in the district." 7B J. Moore, *Federal Practice* 154.1 (1987). Thus although the judges in the United States District Court for the Eastern District of New York had never before sat en banc, the action was not unprecedented. *See, e.g., Hickman v. Taylor,* 4

F.R.D. 479 (E.D.Pa.), *rev'd,* 153 F.2d 212 (3d Cir.1945), *aff'd,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 450 (1947); *In re Jay & Dee Store Co.,* 37 F.Supp. 989 (E.D.Pa.1941); *In re Clover Drugs, Inc.,* 21 F.Supp. 107 (E.D.Pa.1937). More recently, the Eighth Circuit affirmed a decision of the United States District Court for the District of Nebraska sitting en banc concerning the appropriateness of disclosing evidence from secret grand jury proceedings. *In re Disclosure of Testimony,* 580 F.2d 281 (8th Cir.1978).

nesses, and to excuse Jurors 4, 8, and 12 based on their statements on voir dire. He found that "[t]he media attention the proceedings attracted must be laid squarely at the feet of certain defense counsel." In response to the claim by six defendants, Anthony Gurino, Cesar Gurino, Anthony Moscatiello, Oscar Ansourian, Joseph Lo-Presti, and Mark Reiter, that because they were not alleged to have participated in jury tampering, double jeopardy attached to prevent their retrial, he wrote "[t]here simply was no way to salvage this tainted jury for some of the defendants." Finally, he rejected the defendant's request for a hearing on the issue of the Government's intent in seeking a mistrial and an interview of the discharged jurors, noting that the record amply supported Judge Costantino's findings.

## DISCUSSION

■■■ The Double Jeopardy Clause protects a defendant from governmental actions designed to provoke a mistrial " 'so as to afford the prosecution a more favorable opportunity to convict' the defendant." *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976) (quoting *Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963)). Therefore, when the Government moves for a mistrial, it must show a high degree of necessity, a "manifest necessity," to avoid a double jeopardy bar to a subsequent prosecution. *Arizona v. Washington,* 434 U.S. 497, 505–06, 98 S.Ct. 824, 830–31, 54 L.Ed.2d 717 (1978); *Dunkerley v. Hogan,* 579 F.2d 141, 145 (2d Cir.1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979). "[T]he trial court's mistrial ruling is entitled to great deference irrespective of any statement of reasons by the trial court." *Mastrangelo,* 662 F.2d at 950. *See also United States v. Grasso,* 600 F.2d 342, 343 (2d Cir.1979). We previously have rejected the appellants' argument that the Government must prove by a preponderance of the evidence that defendants were responsible for the events triggering the mistrial, *Mastrangelo,* 662 F.2d at 951–52; the test is whether there is a "distinct possibility"

that defendants were responsible for those events. *Id.* at 952. The rationale for adopting this test rather than a higher evidentiary standard applies whether the allegation is, as it was in *Mastrangelo,* the murder of a principal witness or, as here, threats and bribery; namely, to avoid a mini-trial which could last weeks or months and maximize the risk of alerting the jury to the allegations of misconduct. As we said in *Mastrangelo,* 662 F.2d at 952,

> [w]e must not only give due deference to the trial judge's determination, *see Arizona v. Washington; United States v. Grasso,* 600 F.2d at 347, but that determination in favor of the declaration of a mistrial in a case like this—"along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny"— "is entitled to special respect." *Arizona v. Washington,* 434 U.S. at 510 [98 S.Ct. at 833].

■■■ Here, although all the jurors and the alternates denied in open court that anyone had approached them, the evidence did raise a "distinct possibility" that the defendants had identified several of the anonymous jurors and had tried to influence one or more of them. The affidavits of two FBI agents stated that Carneglia, Gotti, Lino, and Ruggiero employed private investigators Sewell and Juliano to identify jurors. In testimony credited by Judge Costantino, Barnes stated that he had been approached by Rosenberg, who apparently believed that Barnes was still on the jury, and that Sewell had followed him and another juror into a garage where they had had a brief exchange. According to tape recordings of Rosenberg's telephone calls, Rosenberg, in preparation for his grand jury appearance, called Charles Carnesi, the attorney who had employed Sewell and who had represented Sewell during his grand jury appearance. These calls contradicted Rosenberg's claim to an FBI agent that he did not know any attorney other than Brian Levinson and his brother-in-law. Given the testimony presented at the hearing and the information the FBI received from confidential sources, the district court

could find that there was a "distinct possibility" of jury tampering.

While the question is a closer one, we also believe that the court properly dismissed the three jurors, especially when we weigh their responses to the court's questions in light of the evidence of jury tampering. The defendants themselves agreed at one point that Jurors 4, 8, and 12 should be excused. Juror No. 4 was not sure whether his parents' fears would affect his judgment; he owned a car with a readily identifiable license plate and lived near close associates of the defendants. Juror No. 8 admitted that he knew that there were allegations of jury tampering and that because of his family's experiences he could not be impartial about the drug charges. He added that he had learned only recently that these charges were a major part of the case. Because it seems implausible that after nine months of trial he had just learned about the drug charges, the trial court may have concluded that Juror No. 8 was concealing the true reason he could no longer be impartial. Juror No. 12 stated that she was not sure that she could remain impartial because she had "put pieces together," which the trial judge could have interpreted as meaning that she had ascertained from the voir dire itself that there were allegations of jury tampering. Although these jurors claimed that no one had tried to influence them, and cited reasons other than jury tampering for their inability to be impartial, it is not likely under the circumstances of this case that a juror who had been approached would admit it in open court. Therefore, the trial court properly could have concluded that leaving these individuals on the jury was not a reasonable alternative.

Once the court had dismissed the three jurors, it properly could find that a mistrial was necessary from the number of jurors remaining.[5] *See United States v. Potash*, 118 F.2d 54, 56 (2d Cir.), *cert. denied*, 313 U.S. 584, 61 S.Ct. 1103, 85 L.Ed. 1540 (1941). Although the Constitu-

tion does not require a twelve-member jury, *Williams v. Florida*, 399 U.S. 78, 103, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 456 (1970), and Fed.R.Crim.P. 23(b) was designed to provide an eleven-member jury in preference to a mistrial, *United States v. Stratton*, 779 F.2d 820, 831 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *see United States v. Gambino*, 788 F.2d 938, 949 (3d Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986), a jury may consist of fewer than twelve jurors only if the parties so stipulate and the court gives its approval or if a juror is excused for just cause after the jury has retired to consider its verdict. Fed.R.Crim.P. 23(b). As a court can grant a mistrial even where the defendant files a motion to proceed with a jury of eleven, *Parker v. United States*, 507 F.2d 587, 589 (8th Cir.1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975); *Potash*, 118 F.2d at 56, Judge Costantino did not abuse his discretion where defendants never offered such a stipulation, *see Peters v. Quick*, 567 F.Supp. 331, 333 (S.D.N.Y. 1983), *aff'd mem.*, 732 F.2d 142 (2d Cir. 1984); *cf. United States v. Hillard*, 701 F.2d 1052, 1055 (2d Cir.) (defendant who did not seek continuance at trial cannot argue it was preferable to mistrial), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983), and the Government never expressed a willingness to consent to an eleven-person jury. Moreover, there was a distinct possibility that, as the defendants had identified several of the remaining jurors, they had also attempted to influence them.

Appellants Moscatiello, Ansourian, LoPresti, Reiter, and Anthony and Cesar Gurino argue that they are entitled to the protections of the Double Jeopardy Clause because the Government never accused them of jury tampering. *See United States v. Glover*, 506 F.2d 291, 297 (2d Cir.1974) (where defendant has done nothing to create problem, he is entitled to double jeopardy protection). We think *Glover* is totally distinguishable. The mistrial in that case was prompted by a *Bruton*

---

5. In a case lasting as long as this one did, the court should perhaps have insisted on a greater number of alternate jurors than the four utilized here.

problem concerning three of the four defendants, *id.* at 293–94, whereas the mistrial here benefited all the defendants, since a jury tainted as to some is tainted as to all.

■ Appellants argue that a hearing was required on the issue of the Government's intent in seeking a mistrial. After three days of public hearings on jury tampering, the district court made sufficient findings of fact which can be reviewed on appeal. *Compare United States v. Wilson,* 534 F.2d 76, 82 (6th Cir.1976) (findings limited to aborted trial). Judge Costantino properly found that appellants did not allege sufficient facts of improper prosecutorial conduct to warrant a hearing. *See United States v. Rivera,* 802 F.2d 593, 601 (2d Cir.1986).

Judgment affirmed. Mandate to issue April 29, 1988.

### APPENDIX A

The court's questions to the jurors who indicated they could not be impartial and the jurors' responses follow:

#### [Juror No. 4]

THE COURT: Did you advise the Court someone in your family had seen some publicity and discussed that publicity?

JUROR NO. 4: Yes, my father. I think it was Wednesday. Before I could stop him, he blurted out what had been going on with the alleged jury tampering and Mr. Barnes' testimony.

. . . .

THE COURT: Because of that, your father discussing it with you and telling you about what he had heard or seen whatever it was on television or otherwise, did you then come in and ask Mr. Conway to have you come in, brought in before me?

JUROR NO. 4: Yes.

THE COURT: Did you come in before me?

JUROR NO. 4: Yes.

THE COURT: Did you give the conversation as to what happened in your own home?

JUROR NO. 4: Yes.

THE COURT: With your father?

JUROR NO. 4: Yes.

THE COURT: And at this time did the Court ask you whether or not under the circumstances you could continue to serve as a juror?

JUROR NO. 4: Yes, you did at that time. I said I wasn't sure.

THE COURT: You were not sure, and you said you didn't know whether you could or not; is that right, sir?

JUROR NO. 4: Yes.

THE COURT: Do you still feel the same today?

JUROR NO. 4: Again, I have been thinking about it and I still at this point don't know whether I can be impartial.

THE COURT: You don't know whether you can be impartial. Thank you. Has anyone contacted you in the meantime—I had forgotten to ask you that question, from the time I spoke to you on Wednesday or till today has anyone contacted you?

JUROR NO. 4: Since?

THE COURT: Since you spoke to me?

JUROR NO. 4: No.

THE COURT: Just another question. Anytime prior to Wednesday have you had any contact or discussed the jury matter with any jurors in this case?

JUROR NO. 4: No.

THE COURT: So they do not know what you told the Court, what you said out here at this point?

JUROR NO. 4: No.

. . . .

#### [Juror No. 8]

THE COURT: Today, as you sit here today, has anyone attempted to contact you, approach you or compromise you as far as you're sitting as a juror in this case?

JUROR NO. 8: No, they have not.

THE COURT: Has anyone discussed this matter with you, in the jury room or with you anywhere else in reference to the case you are sitting on or anything that may take place in relation thereto?

JUROR NO. 8: Only in just sort of a general undercurrent kind of way.

THE COURT: Is that general conversation that would that be taking place?

JUROR NO. 8: For example, at home on Monday I think at the end of the Matlock (phn) when the guy who does the 11:00 o'clock [sic] news, which is was at 9:00 o'clock [sic], said we are covering the following stories. One, was I think it was something in substance to do with jury tampering and mob trial and since we get up at 4:30—I am asleep long before 11:00, so it left my wife rather concerned.

THE COURT: You have not heard any of the discussion that was had at the time that was on the television? Did you listen to any? Did you turn away from it?

JUROR NO. 8: No, becauses [sic] that was the 11:00 o'clock [sic] news and I go to sleep earlier.

THE COURT: You were asleep at the time?

JUROR NO. 8: Yes.

THE COURT: And you [sic] wife made the statement to you?

JUROR NO. 8: (Nodded head.)

THE COURT: When your wife made the statement to you, did you in some way, as gently as you could, tell her you were not to discuss any matter in reference to the case in which you are sitting?

JUROR NO. 8: Yes. I said that I thought it was probably a case in New York. Mattie The Horse.

THE COURT: So you didn't discuss this matter at all?

JUROR NO. 8: No, sir.

. . . .

THE COURT: So as far as you are concerned, has your judgment in any way been impaired so you could not be fair and impartial sitting as juror in this case?

JUROR NO. 8: No, my judgment has not been impaired. The only thing that has changed is that you recall when you originally questioned us, when we were all prospective you emphasized the main issues in the case; conspiracy, harboring, racketeering, and to me those are abstract terms. You said that you would instruct us on those things.

THE COURT: Eventually.

JUROR NO. 8: To me those aren't straight-forward things. They are not clear-cut issues.

THE COURT: Well, you have not received the law yet on that.

JUROR NO. 8: But it seemed when you were doing that back in April, Your Honor, that the fourth subject of indictment, drugs, seemed to be practically an afterthought.

As you were talking to us, you kept emphasizing the first three and it just seems to have gone along, that drugs seem to have to be more of a, perhaps, more of an issue.

THE COURT: I am not looking for your conclusion as to what you are concluding. What took place, as you recall, I told you, you can draw no conclusion until such time as you are asked to deliberate.

JUROR NO. 8: But the subject of drugs comes up as an indictable offense.

In the drug issue, that is not one subject I will be objective on.

THE COURT: Are you telling the Court that you can not [sic] be fair and impartial?

JUROR NO. 8: Not on the subject of drugs based on immediate family experiences involving my children and so forth.

THE COURT: Okay.

JUROR NO. 8: That is my only problem.

THE COURT: I was not advised of this at any earlier time. This is the first time you are making this statement?

JUROR NO. 8: Yes, because that is something that has changed.

. . . .

[Juror No. 12]

THE COURT: [I a]sked you some questions and the questions being, whether or not anyone had approached you or attempted to compromise you in any way, contact you in relation to the issues in this case or any parties in this case? . . . . You said no one had?

JUROR NO. 12: Right.

THE COURT: Is your answer the same today?

[JUROR NO. 12:] The only thing is that I kind of have an idea of—on what this is all about and it is kind of changing my input as to whether I can be impartial or not.

THE COURT: I see. Would you say now because of the delay and your sitting in the jury room all this time you have come to some conclusions within yourself?

JUROR NO. 12: Yes.

. . . .

THE COURT: Those conclusions that you come to within yourself, do they have anything to do with any conversation that might have taken place in the jury room?

JUROR NO. 12: No.

. . . .

THE COURT: So far as you are concerned you have not been in any way in discussion with any of the matters relating to this case, whether it be in the jury room or with anyone else?

JUROR NO. 12: No, not at all.

THE COURT: You also say whether or not something is taking place is affecting your judgment; is that what you are saying?

JUROR NO. 12: Might affect my judgment.

THE COURT: That it might affect your judgment, meaning it might affect you to a point where you might not be able to be fair and impartial?

JUROR NO. 12: Right.

THE COURT: So are you telling the Court that all that has taken place, that this would make it rather difficult for you to come to a conclusion?

JUROR NO. 12: Yes, it would be.

THE COURT: Only because of the events, not because of the trial and evidence that has been submitted.

JUROR NO. 12: No, that is correct.

THE COURT: You are telling me also, that you wouldn't be able to serve any longer because you could not be impartial?

JUROR NO. 12: It would be difficult.

THE COURT: All right. You may step down.

LUMBARD, Circuit Judge (dissenting):

I dissent. I believe that the order of the district court should be reversed and the indictment dismissed as to these defendants. Retrial of these defendants subjects them to double jeopardy in violation of their rights under the fifth amendment of the Constitution.

A mistrial was declared on January 22, 1988, after more than eight months of a trial which began with the selection of the jurors in April 1987 and the presentation of evidence by the government commencing June 1. In light of the length of the government's case and the serious nature of the charges against these defendants, it was the paramount duty of the district court to keep the trial going until the jury brought in a verdict. Without a determination by the court that the jurors were incapable of rendering a verdict based solely upon the evidence presented in the case, the trial should have continued until the jurors either reached a verdict or reported a hopeless failure to agree. The district court made no such determination.

The evidence presented to the court concerning the approach of dismissed juror Gary Barnes, and the attempts to identify the remaining jurors, certainly required the immediate attention of the court. Although the *in camera ex parte* examination of the remaining jurors (at which none of the counsel were present) by Judge Costantino did not disclose that any contact with the jury had occurred; the examination did, however, lead the court to believe that some jurors were uneasy. Up to this time, the jurors had not been sequestered.

Judge Costantino next proceeded to conduct an examination of the jurors in open court with the defendants, counsel and the public present. In my view, the record shows no good reason for this decision. The open court examinations led the court to dismiss three jurors, numbers 4, 8 and 12, without any showing that as a result of any improper activity by the defendants, they could no longer render a verdict on the evidence in the case.

The testimony of those three jurors fell far short of providing a basis for disqualifying any of them. Juror number 4 told the court *in camera* that he was not sure that he could continue to serve because his father had mentioned to him that there had been some allegations of jury tampering. Later, in open court, he said he still felt the same way and "did not know whether [he could] be impartial."

Juror number 8 disclosed that his wife had heard something on the radio about jury tampering and a mob trial. In answer to the court's question concerning whether his judgment had been impaired so that he could not be fair and impartial, he replied that "no my judgment had not been impaired." However, he then volunteered that as the trial progressed, and the issue of drugs became central to the case, that he could not be fair and impartial because of immediate family members' involvement with drugs.

Juror number 12, who denied being contacted about the case, said that he had an idea "of what this is all about and it is kind of changing my input as to whether I can be impartial or not." The questioning ended with him saying that "because of recent events and not because of the trial and evidence that has been submitted" he would find it difficult to be impartial.

In my view, it does not appear from the record that any one of the three jurors could not have decided the case based on the evidence at trial. That is the ultimate test of the "manifest necessity" for a mistrial. *Arizona v. Washington*, 434 U.S. 497, 505–06, 98 S.Ct. 824, 830–31, 54 L.Ed. 2d 717 (1978). By the time they began their deliberations the jurors would have been reminded of their duty to decide the case based solely on the evidence presented many times during the proceedings—first by the judge during jury selection, then by both counsel in the summations, and again by the judge in his charge. Why were those three jurors not reminded of this duty before they were dismissed? Before taking the extraordinary step of declaring a mistrial, it was the duty of the court to urge the jurors to continue to serve and to consider the case solely on the evidence presented at trial.

The examination of the jurors in open court in view of all that had taken place during the preceding three days could only have resulted in making them more uneasy about what was going on. Jury service in such a long trial is at best a strain and entails many personal sacrifices and is compensated largely by the fulfillment of an important civic duty. With few exceptions, those called for jury duty respond to the challenge. They accept the instructions of the judge. Countless times in our opinions, we have reaffirmed our belief that jurors can be relied upon to follow the instructions of the court. *Richardson v. Marsh*, —— U.S. ——, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *United States v. Teitler*, 802 F.2d 606, 617 (2d Cir.1986). In addition, any conceivable prejudice that may have been caused by the jury hearing about the alleged jury tampering from the media could have been cured by a specific jury instruction. *United States v. Feldman*, 299 F.2d 914, 917 (2d Cir.1962).

Here we have not a shred of evidence that any one of these three jurors could not have laid aside their apprehensions and rendered their verdict on the evidence. The judge never asked them to do that and never inquired about whether they could do so. On the contrary, in the setting in which the *voir dire* occurred, it surely must have seemed to all three of these obviously uneasy jurors that they were being offered a way out of continuing the service which had become onerous and the continuance of which may have had unpleasant consequences.

Even assuming that dismissing the three jurors was proper, the record fails to show that the court took every reasonable step to continue the trial with a lesser number than 12. Indeed, before the court made its decision to dismiss the jury, it should have inquired of the defendants whether they would agree to be tried by a jury of less than 12. Neither the court nor the government inquired of the defendants or suggested such an inquiry. Although it is doubtful whether the defendants would

have agreed to proceed with fewer than 12 jurors, at the very least, the court should have made every attempt before deciding to dismiss all three of the jurors. Keeping any one of the three jurors would have saved the jury and allowed the the trial to continue.

The question was not whether any juror was still "impartial"—whatever that ambiguous term might mean to the jurors. The question was whether there were enough jurors that could decide the case on the evidence. At the point a mistrial was declared, only the government's case had been presented to the jury. Thus, it seems more than likely that, at that point, before any defendants' evidence and before summations of counsel, many of the jurors would have formed some opinion. Even without rumors of jury tampering, they may have quite naturally no longer been "impartial."

There was no showing that any remaining member of the jury had been tainted or even approached. There was no showing that as a result of the inquiry by the court that any member of the jury could not have rendered a verdict on the evidence in the case. This, combined with the judge's remarks about his displeasure regarding the trial, the mishandling of the *voir dire*, and his failure to take reasonable measures to retain a jury which could have reached a verdict, leads me to conclude that there was no showing of "manifest necessity" to justify the declaration of a mistrial.

However heinous the crimes of which the defendants stand accused, and however despicable their reputations, they are no less entitled to the protection of the Constitution afforded by the prohibition against double jeopardy.

I would reverse the order of the district court and dismiss the indictment as to these defendants.