UNITED STATES of America, Appellee,

v.

Angelo RUGGIERO, et al., Defendants,

Gene Gotti and John Carneglia,
Defendants–Appellants.

Nos. 629, 630, Dockets 89–1354, 89–1355.

United States Court of Appeals,
Second Circuit.

Argued Jan. 18, 1990.
Decided March 22, 1991.

Mark F. Pomerantz, New York City (Ronald P. Fischetti, David T. Grudberg, Fischetti Pomerantz & Russo, New York City, of counsel), for defendant-appellant Gene Gotti.

Gerald L. Shargel, New York City (John L. Pollok, Hoffman & Pollok, New York City, of counsel), for defendant-appellant John Carneglia.

Matthew E. Fishbein, Asst. U.S. Atty. E.D. of New York, Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. E.D. New York, David C. James, John Gleeson, Robert P. LaRusso, Asst. U.S. Attys. E.D. New York, Brooklyn, N.Y., of counsel), for appellee U.S.

Before FEINBERG, PRATT, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Appellants Gene Gotti and John Carneglia appeal from judgments of conviction entered in the United States District Court for the Eastern District of New York, John R. Bartels, *Judge*, following a jury trial, for racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (1988), narcotics conspiracy in violation of 21 U.S.C. § 846 (1988), and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1988); and, in the case of Carneglia, for traveling in interstate commerce to promote and facilitate the conduct of a narcotics business enterprise in violation of 18 U.S.C. § 1952 (1988).

They contend on appeal that (1) the trial court committed reversible error in rulings with respect to the dismissal of a juror during jury deliberations and the jury's subsequent rendition of verdicts; (2) evidence and leads derived from certain electronic surveillance should have been suppressed because of minimization violations; (3) certain tape recordings were received in evidence without adequate authentication; (4) improper expert testimony regarding drug transactions was admitted; and (5) the district court improperly relied upon *in camera* testimony in sentencing Gotti and Carneglia.

We affirm.

## BACKGROUND

### A. *Procedural History.*

The procedural history of this case is lengthy and complex, and we summarize it only briefly here. We assume familiarity with two prior opinions, *United States v. Ruggiero*, 678 F.Supp. 46 (E.D.N.Y.1988) (*"Ruggiero I"*), and *United States v. Ruggiero*, 846 F.2d 117 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 491, 102 L.Ed.2d 528 (1988) (*"Ruggiero II"*), which treat in more detail certain of the matters hereinafter considered.

The initial trial in this case commenced before District Judge Mark A. Costantino and an anonymous jury on June 1, 1987. On October 22, 1987, the government initiated an investigation, based upon informa-

tion from confidential sources, to ascertain whether efforts were being made to compromise the jury. *See Ruggiero I,* 678 F.Supp. at 47. The investigation resulted in a seriatim voir dire of the individual jurors on January 11, 1988 to determine whether any of them had been compromised, and a hearing with regard to the jury-tampering issue before Judge Costantino that commenced on January 13, 1988. *See Ruggiero II,* 846 F.2d at 120. Upon conclusion of the hearing, the government moved for a mistrial on January 19, 1988. *See id.* at 121.

Later that day, the United States District Court for the Eastern District of New York convened in banc to consider whether the government had made spurious charges of jury tampering to provoke a mistrial, ruled that the charges were appropriate and bona fide, observed that "[a]ny publicity arising from the United States Attorney's application, which may have come to the attention of some jurors and resulted in their doubting their ability to decide the case fairly was not due to the fault of the United States Attorney," *id.* at 122, and concluded that the question whether and when to order a mistrial was properly left to the trial judge. *See id.* at 121–22.

Judge Costantino thereupon declared a mistrial in *Ruggiero I,* concluding "that there is a very high degree of likelihood that the panel sitting on this case has to some extent been compromised as a result of unlawful conduct circumstantially attributable to the defendants." 678 F.Supp. at 48. The case was then reassigned to then-District Judge Joseph M. McLaughlin, who severed the case into four parts, one of which is the subject of the instant appeal.

The defendants moved to bar a retrial on double jeopardy grounds, contending that Judge Costantino had erroneously declared a mistrial. *See Ruggiero II,* 846 F.2d at 122. Judge McLaughlin denied the motion, an interlocutory appeal was taken, and we affirmed in *Ruggiero II,* finding that the

"testimony presented at the [district court] hearing and the information the FBI received from confidential sources" supported the district court's finding "that there was a 'distinct possibility' of jury tampering." 840 F.2d at 123–24.[1] Gotti and Carneglia were then tried, together with Angelo Ruggiero, before Judge McLaughlin, resulting in a second mistrial when the jury was unable to reach a unanimous verdict.

After being reassigned to Judge Bartels, the third trial of Gotti and Carneglia commenced on April 17, 1989 on the basis of a five-count redacted, superseding indictment.[2] Count one charged that from in or about February 1982 until the date of the filing of the indictment, Gotti, Carneglia, and others conspired to make money by engaging in a pattern of racketeering activity, including, but not limited to, the distribution of heroin, in violation of 18 U.S.C. § 1962(d) (1988). Count two charged Gotti, Carneglia, and Ruggiero with taking part in a continuing criminal enterprise between February and June 1982 with five or more individuals with respect to whom Gotti, Carneglia, and Ruggiero occupied "the position of organizer, supervisor and manager," from which activities they obtained substantial income and resources, in violation of 21 U.S.C. § 848 (1988). Count three charged that between February and June 1982, Gotti, Carneglia, and others conspired to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846 (1988). Count four charged that on or about June 11, 1982, Carneglia and Ruggiero travelled in interstate commerce from LaGuardia Airport in New York to West Palm Beach in Florida to promote and facilitate the conduct of a narcotics business enterprise in violation of 18 U.S.C. § 1952 (1988). Count five charged that on or about June 23, 1982, Gotti, Carneglia, and others possessed with the intent to distribute approximately two kilograms of heroin in violation of 21 U.S.C. § 841(a)(1) (1988).

1. We derived the "distinct possibility" standard from *United States v. Mastrangelo,* 662 F.2d 946, 952 (2d Cir.1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982).

2. Ruggiero was not tried a third time because Judge Bartels determined that he was physically unable to stand trial as a result of illness. Ruggiero subsequently died.

At the close of the government's case, the court granted defendants' motion to dismiss the continuing criminal enterprise count. On May 23, 1989, the jury returned a verdict finding Gotti and Carneglia guilty on the remaining counts with which they were charged. Gotti was sentenced to twenty years on count one, fifteen years on count three, and fifteen years on count five, all to run consecutively for a total of fifty years. He was also sentenced to a three-year term of special parole with respect to count five, and assessed a fine of $75,000. The same sentence was imposed upon Carneglia, with the addition of a five-year concurrent sentence on count four.

### B. *Events At and Preceding Trial.*

On November 9, 1981 special agents of the Federal Bureau of Investigation (the "FBI") applied for and received court authorization to intercept communications being conducted over a telephone in a house occupied by Ruggiero at 163–36 88th Street, Howard Beach, New York. In the months prior to the application, FBI agents had been in contact with confidential informants who had reported that Ruggiero was a member of the Gambino organized crime family, which engaged in extortionate extensions and collections of credit and illegal gambling, and that he conducted conversations over the telephone at the above address regarding those activities.

The interception of telephone calls continued at the Howard Beach location until December 1, 1981, when Ruggiero moved to a new residence located at 370 Barnard Avenue, Cedarhurst, New York. Following the move, on December 29, 1981, agents applied for and received authorization to intercept telephone conversations from the two telephones located in Ruggiero's Cedarhurst home for a period of thirty days.[3]

On April 5, 1982, in addition to receiving authorization to intercept wire communications for an additional thirty days, agents applied for and were given authority to place electronic surveillance devices in several rooms of Ruggiero's Cedarhurst home. This authorization was extended by subsequent thirty-day orders on May 7, 1982 and June 7, 1982.

Over the course of this surveillance, agents gathered tapes evidencing that Ruggiero and defendants Gotti and Carneglia, in addition to their involvement in illegal gambling and loansharking, were principals in an extensive narcotics enterprise that distributed large quantities of heroin, and, to a lesser extent, cocaine and methaqualone tablets.

We have briefly described hereinabove the major events which occurred from the completion of the primary government investigation to the commencement of the third trial of Gotti and Carneglia before Judge Bartels. Gotti and Carneglia do not challenge the sufficiency of the evidence presented by the government at that trial, which consisted primarily of recordings of telephonic and other conversations resulting from the surveillance described hereinabove. Rather the "principal issue raised on the appeal," according to appellants' counsel, is "whether the trial judge erred in his handling of the events that took place after the jury retired to consider its verdict."

Counsel delivered their summations to the jury on May 16, 1989. Earlier that day, the office of the United States Attorney for the Eastern District of New York received a telephone call from an attorney representing a man named Walter Arnold, who was a resident of Kings Park, New York. The attorney reported that Arnold had received the following anonymous note:

Walter Arnold

84 Broadview Ave.

Kings Park, LI NY

Dear Mr. Arnold:

I am writing this letter as a concerned neighbor and friend.

It has come to my attention that you are a juror on the Gotti trial. Our neighbor who lives on the same block, Federal

---

**3.** 18 U.S.C. § 2518(5) (1988) imposes a thirty-day limitation upon authorizations for the interception of wire, oral, or electronic communications.

Agent William Noon is in charge of the Gotti investigation.

As you know, Kings Park is a very small community. Our children go to the same schools, we shop in the same stores.

It seems improper that you be on the same jury where the head FBI agent in charge is your neighbor.

In all conscience you should bring this matter to the attention of the judge, goverment [sic] and the court.

I know you will do the right thing.

A Concerned Neighbor and Friend.

As it turned out, Arnold was not on the jury. However, the attorney reported that Arnold's neighbor, whose name was not mentioned, was a juror. It was subsequently determined that Walter Arnold's neighbor was anonymous Juror No. 9. Following this discovery, and prior to the commencement of jury deliberations, Judge Bartels dismissed Juror No. 9 and replaced him with alternate Juror No. 1.

On May 22, 1989, the sixth day of jury deliberations, the jury sent out the following note: "One juror refuses to vote, are there any guidelines to help us." Judge Bartels decided to give an *Allen* charge, *see Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157–58, 41 L.Ed. 528 (1896), in response to that note. Defense counsel asked to see the proposed instruction before it was delivered, but Judge Bartels declined to allow this, stating: "On behalf of the United States District Court I'm not giving it to you." He then delivered the following instruction to the jury:

I will read the note that the court received from the jury. One juror refuses to vote. Are there any guidelines to help us?

Well, ladies and gentlemen of the jury, as you are aware in order to return a verdict in this case, each juror must agree thereto.

In other words, your verdict must be unanimous. You should, therefore, consider this case, and deliberate upon it, and reach a verdict without fear or sympathy. You must remember at all times, that the government has the burden of proof beyond a reasonable doubt.

Now, the jury in this case was selected carefully. When you filled out the juror questionnaire, and again when you were interviewed, each of you was asked, "is there any reason why you could not render a fair and impartial verdict in this case?" Each of you said "no." All jurors took an oath when the panel was picked in this case that they would try this case and, "a true verdict rendered [sic] according to the evidence and the law."

So then, every juror swore to render a verdict. To render a verdict each juror must vote, one way or the other. The court is not interested which way you vote and reminds you that no juror should surrender his or her honest conviction as to the weight of effect of the evidence for the sole purpose of determining a verdict, and a juror should not hesitate to re-examine his own views and change his opinion if convinced it's erroneous, but he should vote.

The court is not interested who the juror is who has not yet voted and is not interested in the way the other jurors have voted or not voted. The matter is completely open. No juror, however, should in any way feel coerced by any comments I made.

Therefore, would you be kind enough to return to deliberate.

Later that day, the jury sent out another note, which read as follows: "While attempting to reach a decision concerning the innocence or guilt of the defendants, a juror refuses to discuss the case at all." Following a colloquy with counsel, Judge Bartels determined to conduct an individual voir dire of the juror who was referred to in the two notes, with all counsel present, and ascertain the reasons for the juror's failure to vote and to deliberate. The defense objected, claiming "[i]t's an intrusion into the deliberative process."

The conference was then held in Judge Bartels' chambers. The juror in question turned out to be Juror No. 9—the former Alternate Juror No. 1. Juror No. 9 indi-

cated that the note was incorrect, and that he and all of the other jurors had voted following the court's *Allen* charge. He also stated that he had discussed the case "in my own way with them," adding that his fellow jurors had been "trying to persuade me to vote one way or the other," and that "I vote on my conscious [sic]." Juror No. 9 was then sent back to the jury room. At this point, the defense moved for a mistrial, and the court denied the motion.

Shortly after Juror no. 9 returned to the jury room, Judge Bartels delivered a second *Allen* charge to the jury, over the defense's objection, as follows:

> I have received notice that the juror who you mentioned in your last memorandum has discussed the case and has voted.

> I have also received notice that you are deadlocked [4] and I'm going to ask you to try once more. This case has been on trial for over five and a half weeks and the jury has been sequestered for, approximately, five and a half days. I do not believe that the case can be submitted to twelve men and women who are more intelligent or competent to decide it.

> In order to return a verdict in this case each juror must agree thereto. In other words, your verdict must be unanimous if it's to be a verdict. However, you only have to vote and you do not have to agree. You can disagree amoung [sic] yourselves, but you do have to vote one way or the other. You do not have to bring in, however, a verdict on all the counts at the same time. In your deliberation, jurors have a duty to consult with each other, and to deliberate with a view to reaching an agreement if it can be done without violence to any individual judgment.

> Although each juror must decide the case for himself, this should only be done after an impartial consideration of the evidence with his fellow jurors. In the course of your deliberation a juror should not hesitate to re-examine his own

view and to change his opinion if convinced it is erroneous. Each juror who finds himself to be in the minority should reconsider his view in the light of the opinion of the jurors of the majority. Conversely each juror finding himself in the majority should give equal consideration to the view of the minority.

> No juror should surrender his honest conviction as the weight or effect of the evidence of his fellow jurors or for the purpose of determining a verdict.

> But remember also that after full deliberation and consideration of all the evidence, it's your duty to try to agree upon a verdict if you can do so without violating your individual judgment and conscience.

> I'll ask you to retire and resume your deliberations for such time you in your conscientious judgment seems reasonable with the hope that you conscientiously reach an agreement.

The court then offered the jury the option of continuing its deliberations or retiring for the evening, and the jury returned to the jury room to consider the matter. A short time later, the jury sent out two notes. The first one stated: "The jury will stay late this evening and try to work things out." The second note read: "A juror requests a private conference with Judge Bartels."

In response to the second note, Judge Bartels instructed the jury that he could not have a private conference with an individual juror, but that any juror could ask him questions by sending him a note.

Thereafter, the court received a note from Juror No. 9, which read as follows:

5/22/89

Att Judge Bartels:
There are two point [sic] I would like to address to you. No. (1) there were [sic] talk in the juror room concerning the fact that I could (go) to jail. And what would happen to my family left behind. Tollerence [sic], and patience is [sic] not prevailing in the juror room. No. (2) I

---

4. Upon inquiry by defense counsel after this instruction was given, the court conceded that

no note had been received to indicate that the jury was deadlocked.

strongly feel that my residence is known, and is [sic] very concerned for my family. I simply can't be persuated [sic] or forced to vote against my belief and conscience.

Yours truly

Juror # 9

A colloquy between the court and counsel concerning this note ensued. Defense counsel suggested, as a "hypothetical," that Juror No. 9 was the lone holdout for acquittal, and that the other jurors had told him that he could go to jail unless he changed his vote. The government contended that the note evidenced that the juror had been threatened.

Judge Bartels then called Juror No. 9 into his chambers, with counsel present. The judge first assured the juror that there was no possibility of his going to jail. He then inquired whether the juror had voted, after specifying that he was not interested in which way he had voted. Juror No. 9 responded that he and all of the other jurors had voted. The judge then asked the juror to step outside, and asked counsel whether there were any additional questions. Defense counsel responded in the negative and again moved for a mistrial. The government requested that the juror be sent back to continue deliberations, but raised the question of the juror's expressed fear that his residence was known. Judge Bartels then called the juror back in and told him: "[A]s far as we know no one knows your residence. You can go back and feel free on that."

At approximately 7:30 p.m. that same evening, the court called the jury into the courtroom and asked the foreman whether all jurors had voted. The foreman responded that all jurors had voted, and, while they had not yet reached a decision, he thought that they would have a verdict "this evening or tomorrow." Shortly thereafter, the jury retired for the evening.

The following morning, the jury sent out the following note:

> Over the course of the last seven days of deliberations, the jury has reached an informal, unanimous agreement as to the guilt of the defendants on the 4 counts involved in the indictment. However, due to the fears of one juror relating to alleged threats he received prior to deliberations, the jury is unable to reach a formal unanimous verdict on any of the 4 counts. It is the conclusion of the jury that this situation cannot and will not be resolved.

The court ascertained that the juror referred to in the note was Juror No. 9, and called him into chambers to question him on the record with only law clerks and a court reporter present. To "achieve maximum candor and comfort," the court decided that counsel should not be present.

Juror No. 9 told Judge Bartels of an encounter with two men in the driveway of his home as he returned from church services at approximately eleven o'clock on the night of May 16—the evening before the case was submitted to the jury and the jury was sequestered, and also the evening before he was substituted for the initial Juror No. 9.

> I drove into the driveway and opened the garage, when I opened the garage and put the light on, after I came out of the garage door, immediately standing behind my vehicle was [sic] two individuals. They didn't threaten me per se. They say, you are Mr. Edwards.... it was a black individual and a white individual to be bluntly [sic] and more specific. The black individual said good evening Mr. . . .
>
> I couldn't deny that I'm not Mr. Edwards [sic], and he said, you are on the Gene Gotti jury trial or something like that. I didn't say, yes or no.... They immediately turned around and left.

The juror described the two men as being "fairly well built, at least six feet, possibly six two." He did not know the men but assumed that they had been spectators at the trial. Juror No. 9 explained that he did not initially notify the court of this incident because he was not then frightened: "It wasn't a threat per se as if you don't do this we'll do this to you or if you do this we'll do this to you or whatever."

On May 20, however, after returning to his hotel room from attending an evening church service, the juror had difficulty sleeping because, as he explained: "[F]or some reason or another it began to—it began to come to me, began to dawn on me as to why were those particular individuals in my driveway."

Juror No. 9 related that the other jurors first became aware that something was bothering him during the deliberations on May 22, the day that the jury sent out notes that one of the jurors had not voted. However, Juror No. 9 did not explain the true cause of his distress until the following morning. As he described the incident to Judge Bartels:

I said well, I wanted to tell my fellow jurors, I want to share something with them. I think they deserve an explanation and at that point I told them in about two or three minutes in the conversation, I became filled up and I did begin to cry and I explained to all of them involved and I explained to them as to why.

He added that he had hoped to be able to "handle the load" personally, but was concerned for his wife and daughter, both of whom had been institutionalized for mental problems.

The judge then questioned the juror regarding the effect of the visit by the two men upon his deliberations:

THE COURT: You have a fear because of that visit, is that true?

JUROR: Yes, sir, I do.

THE COURT: Therefore, because of that fear you voted the way you voted?

JUROR: That's true.

I didn't—I had questioned some of the testimony along the way, the various counts and whatever—

THE COURT: What do you mean the various counts?

JUROR: I said some of the testimony of the various counts.

THE COURT: I see.

JUROR: One and two of the charge or whatever and I went along for the most part, but—I was sort of hesitant. We had gone over this so much and so much and so much and the same thing and I wasn't one hundred percent sure—my mind was wasn't one hundred percent sure of each of the counts and the accusation and things that they actually did happen.

\* \* \* \* \* \*

THE COURT: All I wanted to know is whether or not—whether or not fear motavated [sic] your vote?

JUROR: Not completely, but there was some aspects of it but not completely.

THE COURT: Not completely.

JUROR: Yes, sir.

The court had this voir dire transcribed immediately and made available to all counsel. The government moved for the dismissal of Juror No. 9 pursuant to Fed.R. Crim.P. 23(b). The defendants opposed the motion and moved for a mistrial, contending, *inter alia*, that Juror No. 9 had been voting his conscience and that the account concerning the two unknown men might have been a "ruse" to avoid further jury service. In light of this dispute, Judge Bartels decided to hold an additional voir dire of the juror, because, as he explained, "I want to know unequivocally, is he voting because of fear."

The judge called Juror No. 9 into chambers and asked him about the note he had written the previous day. The juror stated, "I made two points in that note." The first point, according to the juror, was that "[a]t that point I felt I was being coerced, persuaded by my fellow jurors." Juror No. 9 stated that the other jurors had told him, "if I didn't do what was right, whatever, there could be a grand jury investigation" and that he could go to jail. The judge then addressed the second point mentioned in the note:

THE COURT: Nevertheless, your vote was motavated [sic] by fear?

JUROR: Yes, sir.

THE COURT: Generated by meeting those two men in the dark; is that right?

JUROR: Yes, sir.

THE COURT: This note is resentment against the jurors, but it doesn't effect [sic] the fact that you were motavated

[sic] by the fear generated by those two men?

JUROR: Basically, yes, sir.

THE COURT: When you voted?

JUROR: Yes, sir.

THE COURT: Could you be an impartial—render a fair and impartial verdict after having such fear generated by those two men?

THE JUROR: Up to a point. As I said up until I think Saturday I was—I was on course, really on course with my fellow jurors, up to that point. The turning point, taking place like Saturday evening, the turning point.

THE COURT: When did you vote, by the way?

JUROR: We voted yesterday.

THE COURT: Was it inspired by fear of any kind?

JUROR: Yes, your Honor.

THE COURT: That's the answer I think. We can't have fear of any type. You were fearful, is that the story? Is that the truth?

JUROR: It's the truth.

THE COURT: This note primarily related to what the jurors told you and you were not going to be persuaded or forced to vote against your belief and conscience.

JUROR: Yes, sir.

THE COURT: But you were nevertheless voting out of fear.

JUROR: Yes, sir.

 \* \* \* \* \* \*

JUROR: I have a point I just want to get over it briefly. We have the highest regards and respect for you and what you have done throughout the trial, the patience. That is what puzzles me. That has been a mystery to me.

I felt like when you asked me the question this morning, if you had in mind if it was a physical threat or a promisory [sic]—that a threat was made. As I had—in itself the fact that two complete strangers and the fact that they knew that I was on a particular trial.

THE COURT: It started something up here in your head to create fear, is that your story?

JUROR: Yes, sir, that is.

THE COURT: You see you can understand there is something that puzzled me between this note and what you said this morning. Now I understand it. It is fear.

JUROR: Yes, sir.

The reporter then read the voir dire to counsel in chambers. The government again moved that Juror No. 9 be excused for "good cause" pursuant to Fed.R. Crim.P. 23(b), and the defense renewed its motion for a mistrial. The court granted the government's motion. There was also discussion concerning the impact of the removal of Juror No. 9 upon the other jurors. The government argued that any voir dire of the remaining jurors should be postponed until after the verdict, because any preverdict inquiry regarding that subject "could probably taint them even more and prevent a verdict by trying to discuss this." The court then said: "I think I ought to ask them whether they can render a fair and impartial verdict under the circumstances that arise from the dismissal of juror number nine." The defense responded: "I stand by the position that a mistrial be granted." The defense immediately thereafter asked the court "to instruct the remaining eleven jurors that they must begin their deliberations all over again from scratch."

Judge Bartels then called the remaining eleven jurors into the courtroom and gave them the following instruction:

Members of the jury, for reasons with which you are not concerned juror number nine has been dismissed, which should in no way affect your further deliberations.

Consequently the remaining jurors are requested to go back to the jury room and carefully re-examine all the evidence from the beginning and any conclusion [sic] that have been reached so that they can reach a true and impartial and fair verdict, one way or the other, without bias or sympathy and without consider-

ing the dismissal of jury [sic] number nine.

When the jury retired, defense counsel contended unsuccessfully that Judge Bartels had reneged upon a commitment to conduct a poll of the remaining jurors regarding their continuing ability to render a fair verdict. Approximately ten minutes later, the jury reported that it had reached a decision. The judge called the jury back into the courtroom and gave them the following additional instruction:

> I have a note here that says the jury has reached a decision. I don't want to know what that decision is. I don't think you have had time enough to deliberate by yourself [sic] independently after I dismissed jury [sic] number nine.
>
> I'm going to ask you again to go over some of that evidence carefully and lay aside anything that you might have heard from juror number nine, because it is necessary that you do deliberate as an independent jury, independent of juror number nine.
>
> Please be kind enough to go back again and do some deliberation as I have suggested that you do.

Shortly thereafter, the jury requested, and was provided with, new verdict forms.

Three hours later, at approximately 8:30 p.m., the jury sent out a note which said: "We have thoroughly considered all of the evidence in this case and have reached a unanimous decision." The jury then reported a verdict of guilty on all counts.

Following the receipt of the verdict, the court thanked the jurors for their "outstanding devotion as citizens to your important work as jurors." At the instance of the government, the jurors were then asked the following questions:

1. Was your verdict based upon the evidence and no other reason?
2. [D]id anything that juror number nine say [sic] to you during deliberation affect your verdict in any way?
3. Did juror number nine's dismissal affect your verdict in any way?;

The jurors individually and unanimously responded affirmatively to the first question, and negatively to the others.

The government then moved to remand Gotti and Carneglia, and a three-day hearing was held regarding that motion. During that hearing, the FBI "case agent," William C. Noon, was examined in open court concerning conversations with two confidential sources and with four FBI agents who were each the contact agent for an additional confidential source, and Judge Bartels examined the latter four agents *in camera*. Tape transcripts were also introduced in evidence. The court determined that Gotti and Carneglia both posed a risk of flight and a danger to the community, and ordered that they be remanded. The information adduced at the bail hearing was then utilized at the subsequent sentencing proceeding, at which the sentences hereinabove described were imposed.

This appeal followed. Further factual matters are set forth hereinafter in connection with the issues to which they relate.

## DISCUSSION

Appellants raise the following five issues on appeal: (a) whether the district court acted properly in handling problems which arose during jury deliberations; (b) whether the district court correctly held that surveillance agents complied with the minimization requirements of the eavesdropping orders; (c) whether the district court admitted the wiretap evidence without adequate authentication; (d) whether the district court properly admitted expert testimony; and (e) whether during sentencing the district court improperly relied upon hearsay evidence of appellants' continued narcotics trafficking and ties to organized crime.

### A. *Jury Deliberations.*

Appellants' main claim on appeal is "that the trial court's handling of the jury deliberations was erroneous in several respects." They contend that the two *Allen* charges to the jury were unduly coercive, that Juror No. 9 was improperly dismissed, and that the district court further erred by failing to conduct an individual, in camera

voir dire of the remaining jurors following the dismissal of Juror No. 9. The government responds that "the rulings of which the defendants complain rest upon factual findings and discretionary determinations that the district court was uniquely qualified to make," and accordingly that "defendants simply cannot satisfy the heavy burden required to disturb those rulings on appeal." In reviewing these claims, we recognize that jury deliberations represent a "critical stage of a criminal trial." *United States v. Ronder*, 639 F.2d 931, 934 (2d Cir.1981) (citing *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946)).

### 1. *The Allen Charges.*

■ Turning first to the question of the *Allen* charges, we note that this circuit "has consistently reaffirmed its approval of the supplementary charge to encourage a verdict in the face of an apparent deadlock." *United States v. Hynes*, 424 F.2d 754, 757 (2d Cir.) (citing *United States v. Barash*, 412 F.2d 26 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969); *United States v. Meyers*, 410 F.2d 693 (2d Cir.), *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 86 (1969); *United States v. Rao*, 394 F.2d 354 (2d Cir.), *cert. denied*, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116 (1968); *United States v. Bilotti*, 380 F.2d 649 (2d Cir.), *cert. denied*, 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300 (1967); *United States v. Kenner*, 354 F.2d 780 (2d Cir.1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1223, 16 L.Ed.2d 301 (1966)), *cert. denied*, 399 U.S. 933, 90 S.Ct. 2270, 26 L.Ed.2d 804 (1970). "The propriety of an *Allen*-type charge depends on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (in banc) (citing *United States v. Green*, 523 F.2d 229, 236 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976)), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978).

Appellants contend that the *Allen* charges in this case were improperly coercive, noting especially that two such charges were given. They also assert that the district court erred in refusing to let defense counsel review and comment upon the initial charge before it was delivered to the jury, despite an explicit request by counsel that this be done.

■ We note first that the initial *Allen* charge responded to a jury note indicating that a juror refused to vote, rather than that one or more votes had resulted in a jury deadlock (the usual situation calling for an *Allen* charge).[5] *Cf. United States v. Roman*, 870 F.2d 65, 77 (2d Cir.) (follow-up instruction the "first real *Allen* charge, since the court's response to the jury's prior note was merely a clarification of the jurors' individual responsibilities without an exhortation that they reach a decision"), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). In any event, we do not regard a repeated *Allen* charge as inevitably coercive. *See id.; United States v. O'Connor*, 580 F.2d 38, 44 (2d Cir.1978); *Robinson*, 560 F.2d at 517–18. In this case, moreover, the district court included in both instructions the sort of cautionary language counselling jurors not to surrender any conscientiously held views that we have usually deemed to negate coercion. *See, e.g., United States v. Burke*, 700 F.2d 70, 80 (2d Cir.1983), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Valencia*, 645 F.2d 1158, 1167 (2d Cir.1980); *United States v. Brown*, 582 F.2d 197, 202 (2d Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *Robinson*, 560 F.2d at 517.

■ Most fundamentally, however, it is clear at least with the aid of hindsight that the single juror who was holding out against a guilty verdict was Juror No. 9, who was ultimately dismissed before the jury returned its verdict. Accordingly, any coercive impact of the *Allen* charges upon

---

**5.** Indeed, no deadlock was reported to the court prior to the second *Allen* charge. *See supra* note 4.

that juror was indisputably rendered irrelevant, and accordingly unprejudicial, by his dismissal from the jury panel. If he was *improperly* discharged, of course, or if the jury's subsequent deliberations were prejudicially compromised, independent grounds for reversal would result. On the facts presented here, however, we see no basis to conclude that the giving of the two *Allen* instructions constituted reversible error.

■ Similarly, the court's refusal to allow defense counsel to review and comment upon the initial *Allen* instructions was inappropriate, *see United States v. DiLapi*, 651 F.2d 140, 145 (2d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Ronder*, 639 F.2d at 934, but no prejudice resulted. *See DiLapi*, 651 F.2d at 146; *United States v. Turbide*, 558 F.2d 1053, 1063–64 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Robinson*, 560 F.2d at 516–17.

### 2. *The Dismissal of Juror No. 9.*

Appellants contend that the district court improperly dismissed Juror No. 9, and should instead have urged him to set aside his apprehensions and continue to deliberate.

The district court followed the procedure which we outlined in *United States v. Aiello*, 771 F.2d 621, 629 (2d Cir.1985):

> Upon learning of an unauthorized communication by a third person with a juror about a case pending before the juror, the judge must investigate the matter to determine whether the juror's ability to perform her duty impartially has been adversely affected. The extent of that investigation and the method of conducting it will, of course, depend on the surrounding circumstances, including the content of the communication and the apparent sensitivity of the juror. The trial court must be given wide discretion to decide upon the appropriate course to take, in view of his personal observations of the jurors and the parties.

Fed.R.Crim.P. 23(b) provides that "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." "Whether in the circumstances 'just cause' exists to excuse a juror is a matter within the discretion of the district court." *United States v. Casamento*, 887 F.2d 1141, 1187 (2d Cir.1989) (citing *United States v. Stratton*, 779 F.2d 820, 832 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986)), *cert. denied*, — U.S. —, 110 S.Ct. 1138, 107 L.Ed.2d 1043; — U.S. —, 110 S.Ct. 2175, 109 L.Ed.2d 504; — U.S. —, 110 S.Ct. 2564, 109 L.Ed.2d 746 (1990).

■ We see no basis for overturning the district court's exercise of discretion in dismissing Juror No. 9. Judge Bartels conducted two extensive interviews of the juror to probe his mental state in the aftermath of the disturbing encounter in his driveway the night before the jury's deliberations began. The juror expressed a continuing state of fearfulness, told the judge that he had broken down in the course of apprising his fellow jurors of his situation, and had at one juncture refused to render any vote at all on the counts of the indictment. Given these facts and the attendant circumstances recited earlier herein, we would be rash indeed to second guess the conclusion of the experienced trial judge, based in large measure upon personal observations that cannot be captured on a paper record, that Juror No. 9 was disabled by fear from continuing to participate in the jury's deliberations.

### 3. *Postdismissal Deliberations by Remaining Jurors.*

Appellants press most strongly their claim that the district court erred in its handling of the jury deliberations that occurred after Juror No. 9 was dismissed. Initially, they contend that despite the discretion vested in the district court by Fed. R.Crim.P. 23(b), a mistrial should have been declared when the juror was dismissed because he had apprised his fellow jurors (prior to informing the court) concerning the incident in his driveway, there-

by fatally infecting their capacity to deliberate and render a proper verdict. In any event, appellants argue, it was reversible error to allow the trial to proceed without conducting an inquiry of the remaining jurors, immediately following the dismissal of Juror No. 9, as to any impact his dismissal and the attendant events might have had upon the jury's deliberations.

■ We disagree. Rule 23(b) certainly vested the district court with adequate discretion to determine that this third trial of the charges against Gotti and Carneglia should proceed to a verdict by the remaining jurors. Further, decisions as to when to question jurors and the manner of that inquiry are generally left to the trial judge's broad discretion. *See, e.g., United States v. Chang An–Lo*, 851 F.2d 547, 558 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir.1987), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1114, 99 L.Ed.2d 275 (1988); *Aiello*, 771 F.2d at 629; *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983); *United States v. Phillips*, 664 F.2d 971, 998–1000 (5th Cir. Unit B Dec. 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). We note, moreover, that "if the members of the jury are questioned in depth about a possible jury tampering incident, they may become so prejudiced that the accused cannot obtain a fair trial." *United States v. Moten*, 582 F.2d 654, 661 (2d Cir.1978).

In the colloquy between the trial judge and counsel following the final interview of Juror No. 9, the government pressed the view that Juror No. 9 should be dismissed and the case left with the remaining jurors, pursuant to Fed.R.Crim.P. 23(b), and that any voir dire of the remaining jurors should be postponed until after the verdict, citing *Moten*. The following colloquy then ensued:

> MR. FISCHETTI (counsel to Gotti): The point is with that, and I'm familiar with Motten [sic], although I haven't read it recently. The point Mr. Shar-gel and I are making is *there is no need at this point to conduct an inquiry of the jury before or after a verdict*, since we already know from this jurors [sic] statements to your Honor, that he has already discussed this problem, this per se alleged implied threat, this already has been going on. This has already infected the jury.
>
> Now one way or the other, if your Honor does not declare a mistrial, as we asked for and we do—the juror is discharged and we get a verdict, one way or another, I think both sides can argue from this record it's very very clear that this jury has been affected by a member [sic] of extraneous forces. I'm laying aside the fact that we say he was coerced in the jury room. But there is no doubt that the jury knows—
>
> THE COURT: They know about it. So what?
>
> MR. FISCHETTI: *There is no need to conduct an inquiry.*
>
> THE COURT: *I think I ought to ask them whether they can render a fair and impartial verdict under the circumstances that arise from the dismissal of juror number nine.*
>
> MR. SHARGEL (counsel to Carneglia): Isn't the position then that one of their members has been threatened, that's—
>
> MR. LA RUSSO (government counsel): They're staying [sic] he perceived it as a threat.
>
> MR. SHARGEL: *I stand by the position that a mistrial be granted.*

Emphasis added.

The discussion continued. Judge Bartels granted the government's motion, and said twice that he did not intend to voir dire the jury, whereupon Mr. Fischetti stated: "My motion is to instruct the remaining eleven jurors that they must begin their deliberations all over again from scratch." He twice reiterated this position, concluding: "That's our motion."

The district court then advised the jury that Juror No. 9 had been dismissed, "which should in no way affect your fur-

ther deliberations," and instructed them to "carefully re-examine all the evidence from the beginning" and any previous conclusions reached, "without considering the dismissal" of Juror No. 9. When the jury was ready ten minutes later with a verdict, the court refused to accept it, instructing the jury of the necessity "that you do deliberate as an independent jury, independent of juror number nine." The jury then requested new verdict forms, deliberated three more hours, reported their verdict, and, responding to a post-verdict inquiry, individually and unanimously asserted that neither anything said by Juror No. 9 nor his dismissal had influenced their verdict.

Appellants contend here, as they did below, that the district court reneged upon a commitment to "ask the jurors whether they can render a fair and impartial verdict under the circumstances that arise from the dismissal of juror number nine." In our view, this is not a fair reading of the record. At one point during the pertinent colloquy, it is true, Judge Bartels stated his intention as quoted above. This comment followed, however, two explicit statements by defense counsel that no inquiry was needed. Defense counsel responded to Judge Bartels' comment, furthermore, by insisting that a mistrial should be declared. When the court granted the government's motion and did not declare a mistrial, defense counsel then stated three times that the jury should begin its deliberations "from scratch," concluding: "That's our motion." In the course of that colloquy, the trial judge stated twice that he did not intend to conduct a voir dire at that juncture, eliciting no objection from defense counsel.

In accordance with defense counsels' request, the jury was then instructed to "carefully re-examine all the evidence from the beginning and any conclusion [sic] that have been reached," and also enjoined to disregard the dismissal of Juror No. 9. Only after that instruction had been given and the jury had resumed its deliberations did defense counsel belatedly insist upon the preverdict inquiry for which they now contend. Consistent with the instruction, the court refused to accept a subsequent

verdict from the jury that it deemed premature. Finally, as suggested by the government, the jury was polled after the rendition of its verdict regarding any impact of the situation regarding Juror No. 9 upon its deliberations.

We discern no error in the district court's handling of this difficult situation. There were pros and cons, as *Moten* indicates, to an interruption of the jury's deliberations to conduct an inquiry regarding the impact of the events regarding Juror No. 9. Equally important, appellants did not seek that relief, and the trial judge provided, in substance, the instruction which the defense requested.

Finally, we perceive no guidance for our resolution of this issue in *United States v. Hernandez*, 862 F.2d 17 (2d Cir.1988), *cert. denied*, 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). We reversed and remanded for a new trial in *Hernandez* because we could "not be confident that [a removed juror's] disagreement with his colleagues was not the cause of his removal." 862 F.2d at 23. We noted that if the juror was excusable for mental incompetence, dismissal should have occurred considerably earlier in the jury's deliberations. *Id.* Here, by contrast, the record is clear that Juror No. 9 was dismissed because the district court determined, on more than ample evidence, that the juror had been intimidated. Further, the dismissal followed promptly upon the court's conclusion that intimidation had occurred and was affecting the juror's deliberations.

### B. *Minimization of Electronic Interceptions.*

■ Appellants claim that the electronic interceptions within Ruggiero's home violated both the statutory requirement that any interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception" under pertinent federal law, 18 U.S.C. § 2518(5) (1988), and various provisions of the orders authorizing the interceptions.

These contentions were exhaustively considered and rejected by Judge Costantino, prior to the first trial of this case, in an evidentiary hearing conducted over a total of nineteen days and in a seventy-page opinion. They were also the subject of an adverse ruling by Judge McLaughlin when appellants renewed their suppression motion after the case was reassigned to him. We see no basis to overturn these carefully considered determinations.

Even if we did, furthermore, Gotti and Carneglia had no expectation of privacy in Ruggiero's home and telephone that would provide a basis for them to seek suppression of this evidence. 18 U.S.C. § 2518(10)(a)(i) and (iii) (1988) provides that "[a]ny aggrieved person" may move to suppress wiretap evidence when "the communication was unlawfully intercepted" or "the interception was not made in conformity with the order of authorization." As we reiterated, however, in *United States v. Gallo*, 863 F.2d 185 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989), a case involving the same electronic interceptions at Ruggiero's home that are challenged here, this provision "is to be construed in accordance with standing requirements usually applied to suppression claims under the fourth amendment." *Id.* at 192 (citing *Alderman v. United States*, 394 U.S. 165, 175–76 & n. 9, 89 S.Ct. 961, 967–68 & n. 9, 22 L.Ed.2d 176; S.Rep. No. 1097, 90th Cong., 2d Sess. 12, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2179–80); *see also United States v. Fury*, 554 F.2d 522, 526 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977), 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).

Gotti and Carneglia contend that because we noted, in *Gallo*, that the complaining defendants in that case were "not named as targets of the surveillance," 863 F.2d at 192, whereas Gotti and Carneglia were so named, *Gallo* somehow confers standing upon Gotti and Carneglia vis-a-vis Ruggiero's home and telephone. *Gallo*, however, while mentioning the nontarget status of the defendants in that case, did not invest that fact with any particular significance, much less the decisive force for which appellants contend. We note that in *United States v. Hinton*, 543 F.2d 1002 (2d Cir. 1976), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1977), we concluded that it was doubtful that defendants had standing to raise a minimization challenge to wiretaps on phones not in their residences, *see id.* at 1011 n. 13, even though many of the challenging defendants were named targets of the wiretap orders, *see id.* at 1010.

## C. *Authentication of Tape Recordings.*

Gotti and Carneglia contend that the tape recordings of telephonic and other conversations occurring in Ruggiero's house were inadequately authenticated, in violation of Fed.R.Evid. 901(a), and therefore should not have been admitted in evidence. We agree, however, with the contrary rulings of Judges Costantino, McLaughlin, and Bartels on this issue.

■ Rule 901(a) requires the proponent of any evidence to submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." This requirement is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a)[01], at 901–17 (1990). Recognizing, however, that "recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration, we have adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recordings." *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir.) (quoting *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967)), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). Finally, we review rulings as to authentication for abuse of the district court's "broad discretion." *See United States v. Mendel*, 746 F.2d 155, 167 (2d Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *United States v. Craig*, 573 F.2d 455, 478–79 (7th Cir.1977),

*cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978).

■ Applying these standards, we find no basis for reversal in appellants' contention that the chain of FBI custody was not adequately established with respect to the Ruggiero tape recordings. Appellants concede compliance with the statutory sealing requirement, *see* 18 U.S.C. § 2518(8)(a) (1988); and they do not claim any specific instance of tampering or suspected tampering. Their contentions go to the weight, rather than admissibility, of this evidence, and thus provide no basis for appellate reversal.

### D. *Expert Testimony.*

Gotti and Carneglia contend that the district court committed reversible error in allowing certain testimony by a government expert witness, Gerald Franciosa of the United States Drug Enforcement Agency. Franciosa had been engaged for sixteen years in carrying out and supervising narcotics-related investigations, and gave testimony concerning the meaning of certain of the recorded conversations that had been introduced in evidence. Appellants' central contention, which they support with references to various specific testimony provided by Franciosa, is that he provided the jury with conclusions and interpretations regarding the recorded conversations, rather than with permissible testimony concerning narcotics jargon and practices.

■ A trial court may admit expert testimony if it finds that such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. "It is well settled that the decision whether to admit expert testimony under Fed.R.Evid. 702 is vested in the broad discretion of the trial court, and that decision will be sustained unless manifestly erroneous." *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.) (citing *United States v. Cruz,* 797 F.2d 90, 96 (2d Cir.1986)), *cert. denied,* 484 U.S. 957, 958, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987), 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Courts have consistently recognized, moreover, that "the oper-

ations of narcotics dealers are a proper subject for expert testimony under Fed.R. Evid. 702." *Id.* (citing *Cruz,* 797 F.2d at 96); *see also United States v. Diaz,* 878 F.2d 608, 616–17 (2d Cir.) (quoting *Nersesian,* 824 F.2d at 1308), *cert. denied,* —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *United States v. Carmona,* 858 F.2d 66, 69 (2d Cir.1988); *United States v. Kusek,* 844 F.2d 942, 949 (2d Cir.), *cert. denied,* 488 U.S. 860, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988); *United States v. Khan,* 787 F.2d 28, 34 (2d Cir.1986).

Some of our opinions can be read as drawing into question expert testimony in drug cases that included conclusions and interpretations. *See, e.g., United States v. Mang Sun Wong,* 884 F.2d 1537, 1543–44 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990); *United States v. Tutino,* 883 F.2d 1125, 1134 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *Nersesian,* 824 F.2d at 1308; *United States v. Brown,* 776 F.2d 397, 400–01 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Young,* 745 F.2d 733, 765–66 (2d Cir.1984) (Newman, J., concurring), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). None of these cases, however, ruled that the admission of such expert testimony constituted error. Furthermore, Fed.R.Evid. 704(a) provides, with an exception not pertinent here, that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

In *United States v. Scop,* 846 F.2d 135 (2d Cir.), *rev'd in part on rehearing,* 856 F.2d 5 (2d Cir.1988), we reviewed and synthesized a number of our rulings in this area, taking into account also rule 704(a) and the advisory note thereto, concluding:

> In each of these cases [*United States v. Brown, supra; United States v. Young, supra; United States v. Carson,* 702 F.2d 351 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) ], we upheld the convictions. We noted in *Brown,* however, that

"there is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found in narcotics cases, leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct fitted the pattern." *Id.* at 401. Nevertheless, the Advisory Committee's Note to Rule 704 cautions against limiting experts to "might or could" formulations when they are prepared to say "did," and *Carson, Young* and *Brown* appear to be consistent with that admonition. Whether these results are desirable is not for us to say in light of the Rules' generally liberated approach to expert testimony.

None of our prior cases, however, has allowed testimony similar to Whitten's repeated use of statutory and regulatory language indicating guilt. For example, telling the jury that a defendant acted as a "steerer" or participated in a narcotics transaction differs from opining that the defendant "possessed narcotics, to wit, heroin, with the intent to sell," or "aided and abetted the possession of heroin with intent to sell," the functional equivalent of Whitten's testimony in a drug case. *It is precisely this distinction, between ultimate factual conclusions that are dispositive of particular issues if believed, e.g., medical causation, and "inadequately explored legal criteria," that is drawn by the Advisory Committee's Note.*

*Scop*, 846 F.2d at 141–42 (emphasis added); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294–95 (2d Cir.1991) ("*[Scop* and *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)] establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."); *Diaz*, 878 F.2d at 617–18 (quoting *Scop*, 846 F.2d at 141–42).

Measured against these standards, we cannot accept appellants' contention that it was reversible error to allow Franciosa to testify to conclusions and interpretations, and we do not perceive any other basis to conclude that the district court abused its discretion in this regard. The challenged testimony by Franciosa typically interpreted or characterized tape-recorded conversations, but did not even arguably attempt to do so in terms of the applicable legal criteria. In addition, we note that the trial judge instructed the jury that it:

should not ... accept [Franciosa's] testimony merely because he is an expert. Nor should you substitute it for your own reason, judgment and common sense.

The determination of the facts in this case rest [sic] solely with you. And it's up to you to determine to what extent you want to give such weight as you desire to the testimony of an expert witness.

### E. *Sentencing.*

As indicated hereinabove, the district court conducted a posttrial hearing to determine whether Gotti and Carneglia should be remanded without bail prior to sentencing, and the information adduced at that hearing was taken into account at their subsequent sentencing. The FBI "case agent," William C. Noon, was examined in open court regarding information he had obtained directly from two confidential sources, and from four other FBI agents who were each the contact agent for an additional confidential source, regarding the continuing involvement of Gotti and Carneglia in narcotics trafficking and organized crime. Numerous tape transcripts were also introduced in evidence.

Gotti and Carneglia concede that hearsay evidence may be used in sentencing, *see United States v. Carmona*, 873 F.2d 569, 574 (2d Cir.1989); *United States v. Fatico*, 579 F.2d 707, 713 (2d Cir.1978), but contend that this procedure violated their due process rights because the hearsay information was challenged and not corroborated, *see Carmona*, 873 F.2d at 574; *Fatico*, 579 F.2d at 713. They also argue that the government did not prove the disputed allegations by a preponderance of the evidence, as required by *United States v. Lee*, 818 F.2d 1052, 1056 (2d Cir.), *cert. denied*,

484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987). We see no merit in these claims.

In its opinion remanding Gotti and Carneglia after the posttrial bail hearing, the district court stated:

> At this *in camera* proceeding, which the court conducted to eliminate one level of hearsay, the agents' testimony matched Noon's testimony.
>
> Furthermore, the agents each independently affirmed to the court that over the course of many years they had found informants A through D to be reliable sources, having been corroborated by subsequent investigations, surveillances, Title III wire taps, and searches. The agents also indicated that the information provided by A, B, C and D [the informants], was further corroborated by information received from other agents and other informants. In short, the testimony of Noon, and in turn that of the FBI agents questioned *in camera*, was based on interlocking, corroborated sources whose long-term reliability was established. *See Gaviria,* No. 88–1232, slip op. at 2855 [*United States v. Carmona,* 873 F.2d 569, 575 (2d Cir.1989)] (where interlocking and meshing hearsay testimony was properly considered *in sentencing*). Thus, the hearsay evidence presented in Noon's testimony had the requisite indicia of reliability and the Court accepts it, along with the rest of Noon's testimony, as credible. The fact that the testimony of Noon and of the other agents was of a general nature and lacked specifics was necessary to protect the informants from retaliation.

In addition, various of the tape transcripts introduced at the remand hearing corroborated the continuing involvement of Gotti and Carneglia in both organized crime and narcotics trafficking. Accordingly, the requirements of both corroboration and proof by a preponderance of the evidence regarding these matters were amply satisfied.

 This being so, the sentencing court in this pre-Guidelines case had "wide discretion in imposing sentence, and, ... if a sentence is within the permissible statutory limits and it does not appear that the court took into account any improper factor, the sentence may not be reviewed on appeal." *United States v. Giraldo,* 822 F.2d 205, 210 (2d Cir.) (citing *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1284–85, 2 L.Ed.2d 1405 (1958); *United States v. Mejias,* 552 F.2d 435, 447 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Hendrix,* 505 F.2d 1233, 1235 (2d Cir.1974), *cert. denied,* 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975)), *cert. denied,* 484 U.S. 969, 108 S.Ct. 466, 98 L.Ed.2d 405 (1987). There is thus no basis for disturbing the sentences imposed upon Gotti and Carneglia.

## CONCLUSION

The judgments of conviction are affirmed.